# 24-30-PR(L)
## 24-785-PR

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

➤➤ ◀◀

MARK DANIELS, RASHID RAHMAN, FELIPE RIVERA-CRUZ, AND TERRY MATHIS,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

PETER ALLEN, BRIAN BERNARD, SHANNON DICKINSON, AARON DOCKERY,
JOHN GRADIA, ANGEL HERNANDEZ, HUGH KNIGHT, HAROLD ORTIZ,
SEAN PRITCHETT, WAYNE STEWART, AND DERRICK WILLIAMS,

*Plaintiffs,*

*(Caption Continued on the Reverse)*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR DEFENDANT-APPELLANT

Oriana L. Kiley
William S. Nolan
Robert S. Rosborough, IV
WHITEMAN OSTERMAN & HANNA LLP
*Attorneys for Defendant-Appellant*
One Commerce Plaza
Albany, New York 12260
518-487-7600



*v.*

DR. CAROL MOORES, IN HER OFFICIAL CAPACITY,

*Defendant-Appellant,*

CARL KOENIGSMANN, MD, JOHN MORLEY, MD, SUSAN MUELLER, MD, DAVID S. DINELLO, MD, PAULA BOZER, MD, JOHN HAMMER, MD, ANN ANDOLA, MD, MIKHAIL GUSMAN, MD, CHUN LEE, MD, KATHLEEN MANTARO, MD, PETER BRASELMAN, MD, DAVID KARANDY, MD, ALBERT ACRISH, NP, KRISTIN SALOTTI, NP, MARY ASHONG, NP, JOHN DOE #1, MD, JANE DOE, MD #3-#50, NP OR PA #1-#50, JOHN DOE, MD #3-#50, NP OR PA #1-#50, AND JOHN DOE #2,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................iv

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED...............................................................................2

STATEMENT OF THE CASE....................................................................2

    A.  The MWAP Policy .......................................................................3

    B.  The Rescission of the MWAP Policy and
        Adoption of Policy 1.24A ............................................................4

    C.  Plaintiffs' Second Amended Complaint ......................................5

    D.  Plaintiffs' Motions for Class Certification
        and a Preliminary Injunction .......................................................6

    E.  The December 23, 2022 Bench Decision......................................8

    F.  The February 2023 Evidentiary Hearing .....................................8

    G.  The Class Certification Decision ...............................................14

    H.  The Preliminary Injunction Decision ........................................15

    I.  The September 2023 Trial...........................................................17

        a.  Plaintiffs' Witnesses........................................................17

        b.  Defendant's Witness ........................................................29

    J.  The Decision on the Merits ........................................................32

    K.  The Permanent Injunction ..........................................................33

    J.  The Fee Award ...........................................................................34

i

SUMMARY OF THE ARGUMENT ....................................................36

ARGUMENT ...................................................................................39

I.   THE DISTRICT COURT ERRED IN GRANTING
AN INJUNCTION AGAINST DR. MOORES .........................................39

   A.  Plaintiffs failed to establish their claims on the merits ......................40

     1.  The District Court erroneously rejected the long-
settled *Monell* test and instead held Dr. Moores
liable in her official capacity under a *respondeat
superior* theory ............................................................40

     2.  Plaintiffs' Proof Failed to Satisfy *Monell* ....................................48

   B.  Plaintiffs Failed to Establish Eighth Amendment
Deliberate Indifference.........................................................55

     1.  Plaintiffs failed to show that their medication
regimens deviated from reasonable medical
practice.........................................................................56

     2.  Plaintiffs failed to show that their medical
providers acted in a manner equivalent to
criminal recklessness ....................................................59

     3.  None of the inmates identified by the District
Court as having received "inadequate treatment"
suffered a constitutional deprivation ...........................61

   C.  Plaintiffs' Proof Failed To Establish Standing or
Irreparable Injury................................................................67

   D.  The Equities Did Not Favor the Overbroad, Intrusive
Relief Granted By The District Court ..................................69

   E.  Plaintiffs' Injunction Claim Is Moot and Barred By
the Eleventh Amendment ....................................................72

ii

II.  THE PERMANENT INJUNCTION ORDER VIOLATES
     THE PLRA ..................................................................................74

III. THE DISTRICT COURT ERRED IN GRANTING
     PLAINTIFFS' MOTION TO CERTIFY CLASS
     PURSUANT TO F.R.C.P. 23(B)(2) .......................................79

     A.  The District Court erred in holding that Plaintiffs
         satisfied the requirements of Rule 23(a) .............................80

     B.  The District Court erred in finding that Plaintiffs
         satisfied the requirements of Rule 23(b) (2) .......................91

IV. THE DISTRICT COURT ERRED IN GRANTING
    CLASS COUNSEL ATTORNEY'S FEES UNDER
    42 U.S.C. § 1988(b) .................................................................94

     A.  Plaintiffs Are Not Prevailing Parties...................................94

         i.   Plaintiffs Are Not Entitled To Fees Because
              The Merits Trial Was For Individual-Capacity
              Claims .........................................................................94

         ii.  Plaintiffs Do Not Meet The Definition of
              Prevailing Party Under 42 U.S.C. § 1988 ...................96

     B.  If Plaintiffs Are Prevailing Parties, The Fee
         Award Must Be Reduced By Half....................................101

CONCLUSION ...................................................................................105

CERTIFICATE OF COMPLIANCE....................................................106

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Thomas*,
  837 Fed. App'x. 32.................................................................62, 67

*Acosta v. Thomas*,
  No. 16-cv-0890, 2019 WL 5197313
  (N.D.N.Y., June 21, 2019), *report and
  recommendation adopted*, 2019 WL 3811859
  (N.D.N.Y. August 14, 2019).....................................................52, 62

*Agosto v. N. Y. C. Dept. of Educ.*,
  982 F.3d 86 (2d Cir. 2020).......................................................40, 41

*Allah v. Michael*,
  506 Fed. App'x. 49 (2d Cir. 2012)..................................................63

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ...................................................................87

*Baffa v. Donaldson, Lufkin, & Jenrette Sec. Corp.*,
  222 F. 3d 52 (2d Cir. 2000]..........................................................86

*Barfield v. Cook*,
  No. 3:18-CV-1198 (MPS),
  2019 WL 3562021 (D. Conn. Aug. 6, 2019) ............................83, 84

*Barfield v. New York City Health and Hosps. Corp.*,
  537 F.3d 132 (2d Cir. 2008).........................................................103

*Barrows v. Becerra*,
  24 F.4th 116 (2d Cir. 2022)...........................................................84

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*,
  520 U.S. 397 (1997) ..............................................................41, 45

iv

*Benjamin v. Fraser*,
  156 F. Supp. 2d 333, 341 (S.D.N.Y. 2001),
  *aff'd but criticized on other grounds*,
  343 F.3d 35 (2d Cir. 2003)............................................................74

*Berger v. Heckler*,
  771 F.2d 1556 (2d Cir. 1985)........................................................92

*Berni v. Barilla S.p.A*,
  964 F3d 141 (2d Cir. 2020)......................................................70, 92

*Brecher v. Republic of Argentina*,
  806 F.3d 22 (2d Cir. 2015)...........................................................89

*Buckhannon Bd. and Care Home, Inc. v. W. Virginia Dep't of Health
  & Hum. Res.*, 532 U.S. 598 (2001) ...........................................96, 97

*Buckingham Corp. v. Karp*,
  762 F.2d 257 (2d Cir. 1985).....................................................68, 69

*Butler v. Suffolk Cnty.*,
  289 F.R.D. 80 (E.D.N.Y. 2013) ....................................................82

*Calcano v. Swarovski N. Am. Ltd.*,
  36 F.4th 68 (2d Cir. 2022)...........................................................67

*Callari v. Blackman Plumbing Supply, Inc.*,
  No. CV-113655ADSAKT, 2020 WL 2771008
  (E.D.N.Y. May 4, 2020), *report and recommendation
  adopted*, No. 211-CV-3655ADSAKT,
  2020 WL 2769266 (E.D.N.Y. May 28, 2020) ...............................103

*Cash v. County of Erie*,
  654 F.3d 324 (2d Cir. 2011)..........................................................42

*Cason v. Seckinger*,
  231 F.3d 777 (11th Cir. 2000)..................................................74, 75

*Castillo v. Cameron County*,
  238 F.3d 339 (5th Cir. 2001).........................................................74

v

*Chance v. Armstrong*,
  143 F.3d 698 (2d Cir. 1998)..............................................................61

*Cipolloni v. City of New York*,
  758 Fed. Appx. 76 (2d Cir. 2018)....................................................42

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)............................................................................67

*City of Oklahoma City v. Tuttle*,
  471 U.S. 808 (1985)..........................................................................51

*Clark v. DiNapoli*,
  510 Fed. Appx. 49 (2d Cir. 2013)....................................................72

*Connick v. Thompson*,
  563 U.S. 51 (2011)......................................................................41, 42

*Custodio v. Am. Chain Link and Constr., Inc.*,
  No. 06-CV-7148, 2014 WL 116147 (S.D.N.Y. Jan. 13, 2014) ......103

*Darby v. Greenman*,
  14 F.4th 124 (2d Cir. 2021)....................................................60, 61, 66

*Darby v. N.Y.C. Health and Hosps. Corp.*,
  No. 18-cv-2869, 2019 WL 1994490 (E.D.N.Y. May 6, 2019),
  *aff'd sub nom.*, 14 F.4th 124 ..........................................................61

*Davis v. City of New York*,
  75 Fed. Appx. 827 (2d Cir. 2003) ..............................................43, 51

*Dean v. Coughlin*
  804 F.2d 207 (2d Cir. 1986)......................................................69, 100

*Duguie v. City of Burlington*,
  161 Fed. Appx. 177 (2d Cir. 2006) ..................................................53

*Dunnigan v. Metropolitan Life Ins. Co.*,
  214 F.R.D. 125 (S.D.N.Y.2003) ......................................................89

*E.E.O.C. v. KarenKim, Inc.*,
    698 F.3d 92 (2d Cir. 2012) ................................................................. 70

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ................................................................. 60, 63, 67

*Exxon Mobil Corp. v. Healey*,
    28 F.4th 383 (2d Cir. 2022) ....................................................... 72, 73

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ............................................................. 68

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ........................................................................ 56

*Farrar v. Hobby*,
    506 U.S. 103 (1992) ........................................................................ 96

*Feaster v. City of New York*,
    No. 20-1122, 2021 WL 4597766 (2d Cir. 2021) .............................. 42

*Florence v. Bd. of Chosen Freeholders of Cnty.*
    *of Burlington*, 566 U.S. 318 (2012) ................................................ 76

*Forts v. Ward*,
    621 F.2d 1210 (2d Cir. 1980) .......................................................... 93

*General Telephone Company of Southwest v. Falcon*,
    457 U.S. 147 (1982) ........................................................................ 83

*Gonzalez v. Scalinatella, Inc.*,
    112 F. Supp. 3d 5 (S.D.N.Y. 2015) ............................................... 103

*Guardians Ass'n of Police Dep't of New York. v. City*
    *of New York*, 133 F. App'x. 785 (2d Cir.2005) ............................. 102

*Gutierrez-Pinto v. Rappa*,
    No. 22-529, 2023 WL 2396732 (2d Cir. March 8, 2023) ................. 59

*Hallett v. New York State Dept. of Correctional*
    *Services*, 109 F. Supp. 2d 190 (S.D.N.Y. 2000) ............................. 12

*Hathaway v. Coughlin,*
    99 F.3d 550 (2d Cir. 1996) ................................................................. 56

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ...................................................................... 102

*Hernandez v Keane,*
    341 F.3d 137 (2d Cir. 2003) ......................................................... 56, 62

*Hill v. Curcione,*
    657 F.3d 116 (2d Cir. 2011) ......................................................... 59, 60

*Hoffer v. Secretary, Florida Dept. of Corrections,*
    973 F.3d 1263 (11th Cir. 2020) ........................................................ 75

*Hu v. City of New York,*
    927 F.3d 81 (2d Cir. 2019) ............................................................... 53

*In re Frontier Ins. Grp., Inc. Sec. Litig.,*
    172 F.R.D. 31 (E.D.N.Y. 1997) ........................................................ 87

*In re Petrobras Securities,*
    862 F.3d 250 (2d Cir. 2017) ................................................... 80, 89, 91

*James Pine v. Hammer et al.,*
    23-cv-7148 ....................................................................................... 72

*Johnson v. Nextel Commc'ns. Inc.,*
    780 F.3d 128 (2d Cir. 2015) ............................................................. 79

*Jones v. Tompkins,*
    715 Fed. App'x. 101 (2d Cir. 2018) .................................................. 59

*Jones v. Town of East Haven,*
    691 F.3d 72 (2d Cir. 2012),
    *cert. denied*, 571 U.S. 940 (2013) .................................. 41, 42, 43, 53

*Kenneth Windley v. Hammer, et al.,*
    23-cv-7151 ....................................................................................... 72

*Kentucky v. Graham*,
 473 U.S. 159 (1985) ...................................................................................94, 95

*Klein v. Empire Blue Cross and Blue Shield*,
 No. 93 CIV. 5187 (JSM), 1998 WL 336633
 (S.D.N.Y. June 23, 1998).............................................................................83

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
 511 U.S. 375 (1994) .......................................................................................98

*Lacen v. Aygemong*,
 2022 WL 14177191 (2d Cir. Oct. 25, 2022)....................................................60

*Laumann v. Nat'l Hockey League*,
 105 F. Supp. 3d 384 (S.D.N.Y. 2015)..............................................................92

*Legg v. Ulster County*,
 979 F.3d 101 (2d Cir 2020)..............................................................................53

*Los Angeles County v. Humphries*,
 562 U.S. 29 (2010) ....................................................................................41, 45

*Lucente v. County of Suffolk*,
 980 F.3d 284 (2d Cir. 2020).......................................................................43, 45

*Mark Daniels v. Mueller, et al.*,
 23-cv-0564 .......................................................................................................72

*Mattison v. Bushey-Calley*,
 No. 20-1120-pr, 2022 WL 2275851 (2d Cir. June 23, 2022) ....................55, 59

*Matusick v. Erie Cnty. Water Auth.*,
 757 F.3d 31 (2d Cir.2014)..............................................................................102

*McAllister v. Call*,
 No. 9:10-CV-610, 2014 WL 5475293 (N.D.N.Y. Oct. 29, 2014)....................76

*McBean v. City of New York*,
 260 F.R.D. 120 (S.D.N.Y. 2009) .....................................................................89

*McCann v. Coughlin*,
  698 F.2d 112 (2d Cir. 1983).............................................................101

*McGee v. Pallito*,
  No. 1:04-CV-00335-JGM,
  2015 WL 5177770 (D. Vt. Sept. 4, 2015)........................................82

*Monell v. Dept. of Soc. Serv. of the City of N. Y.*,
  436 U.S. 658 (1978).................................................................*passim*

*O'Connor v. McArdle*,
  217 Fed. Appx. 81 (2d Cir. 2007)............................................60, 67

*Outlaw v. City of Hartford*,
  884 F.3d 351 (2d Cir. 2018)............................................................42

*Panzirer v. Wolf*,
  663 F.2d 365 (2d Cir.),
  *vacated on other grounds,* 458 U.S. 1105 (1982).........................87

*Patterson v. County of Oneida*,
  375 F.3d 206 (2d Cir. 2004)............................................................43

*Pecere v. Empire Blue Cross and Blue Shield*,
  194 F.R.D. 66 (E.D.N.Y. 2000)................................................81, 83

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986).........................................................................42

*Pennacchio v. Powers*,
  No. 05-CV-985 (RRM) (RML),
  2011 WL 2945825 (E.D.N.Y. July 21, 2011)................................104

*People United for Children, Inc. v. City
  of New York*, 214 F.R.D. 252 (S.D.N.Y.2003) ..............................89

*Perez v. Westchester Cnty Dep't of Corr.*,
  587 F.3d 143 (2d Cir. 2009)...........................................94, 96, 101

*Plummer v. Chem. Bank*,
  592 F. Supp. 1168 (S.D.N.Y. 1984).............................................101

*Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth.*
  *of New York & New Jersey*, No. 16-CV-3907,
  2018 WL 798873 (S.D.N.Y. Jan. 23, 2018) ...................................99

*Rapcinsky v. Skinnygirl Cocktails, LLC*,
  No. 11 CIV. 6546 (JPO),
  2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) ......................................84

*Reyes v. Gardner*,
  93 Fed. Appx. 283 (2d Cir. 2004) ...................................................56

*Reyes v. Wenderlich*,
  No. 14-CV-6338-FPG, 2018 WL 1210892
  (S.D.N.Y. March 8, 2018),
  *aff'd*, 779 Fed. Appx. 55 (2d Cir. 2019) ......................................56

*Reynolds v. Giuliani*,
  506 F.3d 183 (2d Cir. 2007)...........................................39, 41, 45, 51

*Rhodes v. Stewart*, 488 U.S. 1 (1988) ...................................................96

*Richard Vasquez v. Burke, et al.*,
  23-cv-1004, N.D.N.Y.,...................................................................72

*Rivera v. Wohlrab*,
  232 F. Supp. 2d 117 (S.D.N.Y. 2002)............................................76

*Rizzo v. Goode*,
  423 U.S. 362 (2007) .......................................................................39

*Roach v. Morse*,
  440 F.3d 53 (2d Cir. 2006)............................................................40

*Rodriguez v. Gusman*,
  No. 21-2841-pr, 2023 WL 219203 (2d Cir. Jan. 18, 2023) ...........59

*Roe v. City of Waterbury*,
  542 F.3d 31 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009)..................43, 55

*Ruiz v. United States*,
  243 F.3d 941 (5th Cir. 2001)..........................................................74

*Rush v. Fischer*,
   923 F. Supp. 2d 545 (S.D.N.Y. 2013),
   *aff'd*, 649 Fed. Appx. 70 (2d Cir. 2016) .........................................56

*Salahuddin v. Goord*,
   467 F.3d 263 (2d Cir. 2006)...............................................56, 64

*Shain v. Ellison*,
   356 F.3d 211 (2d Cir. 2004).........................................................68

*Shephard v. Fisher*,
   No. 08-CV-9297, 2017 WL 666213 (S.D.N.Y. Feb. 16, 2017).......................56

*Siegel v. Bloomberg L.P.*,
   No. 13-CV-1351, 2016 WL 1211849 (S.D.N.Y. Mar. 22, 2016)...................103

*Smith v. Carpenter*,
   316 F.3d 178 (2d Cir. 2003)........................................................62

*Smith v. Martuscello*,
   602 Fed. Appx. 550 (2d Cir. 2015) ..................................................41

*Spann v. AOL Time Warner, Inc.*,
   219 F.R.D. 307 (S.D.N.Y. 2003) ....................................................87

*Stewart v. U.S. I.N.S.*,
   762 F.2d 193 (2d Cir. 1985)........................................................47

*Thomas v. Wolf*,
   832 Fed. Appx. 90 (2d Cir 2020) ...................................................61

*Thompson v. New York State Corr. & Cmty.*
   *Supervision*, No. 22-CV-6307-FPG, 2022 WL 4562318
   (W.D.N.Y. Sept. 29, 2022) ........................................................76

*Tolliver v. Sidorowicz*,
   714 Fed. Appx. 73 (2d Cir. 2018) .................................................60

*V.W. ex rel. Williams v. Conway*,
   236 F. Supp. 3d 554 (N.D.N.Y. 2017) .............................................82

*Velasquez v. Digital Page, Inc.*,
    124 F. Supp. 3d 201 (E.D.N.Y. 2015) ...........................................103

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................*passim*

*Westefer v. Neal*,
    682 F.3d 679 (7th Cir. 2012)...........................................................78

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) ........................................................................74

*Williams v. Vincent*,
    508 F.2d 541 (2d Cir. 1974)............................................................61

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .....................................................................40, 70

**Statutes**

18 U.S.C. § 3626(a)(1)...........................................................................2

18 U.S.C. § 3626(a)(1)(A) ....................................................................74

18 U.S.C. § 3626(a)(2)..........................................................................16

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1343 .....................................................................................1

42 U.S.C. § 1983 ............................................................................*passim*

42 U.S.C. § 1988 ............................................................................*passim*

42 U.S.C. § 1988(b) ..............................................................................94

Prison Litigation Reform Act of 1995 .............................2, 16, 39, 74, 79

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................1, 6, 8, 15

Fed. R. Civ. P. 23 ......................................................................80, 104

Fed. R. Civ. P. 23(a) ....................................................................*passim*

Fed. R. Civ. P. 23(b)(1)(A) ..............................................................105

Fed. R. Civ. P. 23(b)(1) ...............................................................6, 102

Fed. R. Civ. P. 23(b)(2) ...................................................................*passim*

Fed. R. Civ. P. 23(b)(3) ...........................................................6, 101, 104

**Other Authorities**

141 Cong. Rec. S14611-01, 1995 WL 573055 (Sept. 29, 1995) ...........................76

## <u>JURISDICTIONAL STATEMENT</u>

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

Before this Court are two consolidated appeals: (1) a merits appeal of the District Court's orders (a) granting, on March 31, 2023, Plaintiffs' F.R.C.P. 23(b)(2) motion to certify a class (A39372-39388),[1] (b) denying, on March 31, 2023, Defendant-Appellant Dr. Moores' F.R.C.P. 12(b)(1) motion to dismiss (A39306-39371), (c) granting, on October 31, 2023, Plaintiffs' motion for a permanent injunction (A41132-41211) and entering its terms on November 22, 2023 (A41227-41242), which Dr. Moores appealed from on December 21, 2023 (A44836-44837); and (2) the District Court Judgment entered on March 22, 2024 (A45132), awarding Plaintiffs attorney's fees and costs based upon the Court's March 1, 2024 order (A45131), which Dr. Moores appealed on March 26, 2024. (A45133-45134).

This Court has jurisdiction over these appeals under 28 U.S.C. § 1291.

---

[1] Citations to "A____" shall refer to the Joint Appendix.

1

## ISSUES PRESENTED

1. Did the District Court err in granting Plaintiffs a permanent injunction?

2. Do the terms of the District Court's permanent injunction violate the requirements of the Prison Litigation Reform Act of 1995, 18 U.S.C. § 3626(a)(1)?

3. Did the District Court err in certifying Plaintiffs' class pursuant to F.R.C.P. 23(b)(2)?

4. Did the District Court err in declining to dismiss this action as moot following the complete repeal of the policy that formed the basis for Plaintiffs' complaint?

5. Did the District Court err in granting an award of attorney's fees and costs under 42 U.S.C. § 1988?

## STATEMENT OF THE CASE

This Court should reverse the class-wide permanent injunction that imposed, from the bench, a judicially administered medical treatment process for all inmates with chronic pain, across 44 DOCCS facilities, without any legal basis for doing so. Plaintiffs, a class of inmates in DOCCS' custody, commenced this action challenging, as violative of the Eighth Amendment, DOCCS' health services policy for evaluating the need for and prescribing addictive drugs in its facilities—the "Medications with Abuse Potential" policy ("MWAP Policy"). (*See* A626-767).

2

Although Plaintiffs sought damages against individual DOCCS medical providers, they sought only injunctive relief against then-acting DOCCS Chief Medical Officer ("CMO") John Morley, MD, in his official capacity. (A626-767).

### A. The MWAP Policy

DOCCS adopted the MWAP Policy in response to the opioid epidemic and in recognition that inmates vulnerable to addictive medications in DOCCS' custody are also under significant pressure to divert those medications for illicit purposes. (*See* A31287¶ 13; A40352; A40367).  According to Dr. David Dinello, DOCCS' addiction specialist who authored the MWAP Policy, DOCCS intended to "create a dialogue with providers" so that they "really think about the addictive properties of the medications they're writing for." (A40392).

The MWAP Policy required a Regional Medical Director ("RMD") to review and approve "the use of potentially unsafe medications that have abuse potential." (A279). The list of MWAP medications covered by the Policy included: (i) all medications on the DEA Controlled Substances List; (ii) eight muscle relaxants and (iii) "[o]ther medications," including Neurontin, the preferred drug of most patients who testified in this case.[2]  (A281).

To prescribe an MWAP medication, treating providers had to complete and submit a form to an RMD for prior approval. (A279). The RMDs did not individually

---

[2] In its generic form, Neurontin is known as Gabapentin.

3

review a patient's entire medical history or conduct a physical exam of each patient to determine whether their MWAP medication would be approved. (*See* A40357-40358). Thus, the basis of Plaintiffs' lawsuit was that "the MWAP Policy strips medical treatment decisions from the medical providers and specialists who treat patients and puts it in the hands of remote medical administrators, who invariably deny the MWAP medications, no matter the patient's individual medical needs." (A630). According to Plaintiffs' allegations, the providers' individualized treatment decisions to "deny" or "discontinue" class members' effective medical chronic pain treatment were based on non-medical justifications, *i.e.*, the MWAP Policy. (*See* A630-631).

### B. The Rescission of the MWAP Policy and Adoption of Policy 1.24A

In February 2021, DOCCS rescinded the MWAP Policy and replaced it with Health Services Policy 1.24A ("Policy 1.24A"). (A31316). Policy 1.24A reformed DOCCS' process for prescribing pain management medication and eliminated the RMDs' prior role entirely. (A31286-31287). Policy 1.24A formally and completely dismantled the MWAP Policy; DOCCS no longer implements or enforces it in any capacity. (*Id.*). Under Policy 1.24A, DOCCS' primary care providers ("PCPs") have been free to prescribe any pain medications they deem medically appropriate to treat pain conditions, without prior approval from RMDs. (A31287-31288).

Policy 1.24A requires that PCPs review specialist recommendations and document their reasons if they choose not to follow them. (A31288, ¶ 20). It further requires that chronic pain patients be specifically identified by a code number, 338, which is then entered into a medical database to help staff understand their status and needs. (A31289, ¶ 22-23). Patients identified by code 338 are to be seen by their providers at least every 90 days and receive an annual individualized assessment to evaluate their conditions. (*Id.*).

### C. **Plaintiffs' Second Amended Complaint**

Four months after DOCCS rescinded the MWAP Policy and adopted Policy 1.24A, Plaintiffs filed a Second Amended Complaint ("SAC") that failed to challenge Policy 1.24A or its implementation. (*See* A626-767). Nor did the SAC allege that previously challenged MWAP practices remained ongoing after DOCCS adopted Policy 1.24A. (*See id.*). The SAC continued to allege that the MWAP Policy and practices were unconstitutional, based only upon past conduct occurring between 2017 and 2019. (*See id.*, ¶¶ 270-1029).

The SAC only named CMO Morley, in his official capacity, with respect to the **first** cause of action, titled, "Deliberate Indifference to Health or Safety –Policy Implementation and Enforcement" under 42 U.S.C. § 1983—for injunctive purposes." (A763). Plaintiffs sought injunctive relief to prevent DOCCS from denying MWAP medications to inmates who needed them "based on anything other

than a comprehensive individualized assessment." (A765-766, ¶ 1108).  Neither CMO Morley nor any other official capacity defendant were named as defendants in the second cause of action, which sought only damages. (A764).

CMO Morley moved to dismiss the first cause of action under F.R.C.P. 12(b)(1) as moot and barred under the Eleventh Amendment. (A275).[3]

### D. **Plaintiffs' Motions for Class Certification and a Preliminary Injunction**.

Shortly thereafter, Plaintiffs moved for certification of both a liability class pursuant to F.R.C.P. 23(b)(1)-(3) or (c)(4), and injunctive class pursuant to F.R.C.P. 23(b)(2).  (A777-779).  Plaintiffs defined their injunctive class as:

> All incarcerated individuals who are or will be in the care and custody of the New York State Department of Corrections and Community Supervision who suffer or will suffer from chronic pain and/or neuropathies who require individualized assessments of medical need for treatment with MWAP medications.

(A778). All defendants opposed Plaintiffs' motion to certify the proposed injunctive class. (ECF Case No. 1:19-cv-08173 Dkt. Nos. 450, 457, 463).

In May 2022, more than one year after DOCCS adopted Policy 1.24A, and more than three years after Plaintiffs filed this case, Plaintiffs belatedly moved for a preliminary injunction, while at the same time opposing Dr. Moores' pending

---

[3] In March 2022, Dr. Morley resigned from DOCCS and Dr. Moores was named Acting CMO. (A31286, ¶ 10).  Plaintiffs substituted Dr. Moores as the official capacity defendant. (A29639).

12(b)(1) motion to dismiss. (A27428-29483). Unable to argue that the MWAP Policy was still being implemented (since 1.24A was then in effect), Plaintiffs raised new allegations, not pleaded in the SAC, that DOCCS' efforts to conduct individualized reassessments of patients in 2020, after commencement of the action, were inadequate to address Plaintiffs' MWAP policy allegations.[4] (*See* ECF Case No. 1:19-cv-08173 Dkt. 378, pp. 2-20). The nearly sole basis for Plaintiffs' motion was their medical expert's findings from his review of medical records for 70 patients through 2020, nearly two years before Plaintiffs moved for injunctive relief. (*See generally* ECF Case No. 1:19-cv-08173 Dkt. No. 378; *see also* A780-A25965).

In opposition, Dr. Moores detailed her efforts to ensure the MWAP Policy was no longer being implemented or enforced, and established that Policy 1.24A, on its face and in practice, unequivocally removed the RMDs from assessing, approving, or prescribing pain medication to DOCCS patients. (A31284-31309; A29642-29961).

---

[4] In 2020, DOCCS agreed to "reassess" patients identified by class counsel to determine whether they were being treated appropriately for their chronic pain issues. (A28078). Then CMO Dr. Morley instructed providers to review "at least one year's worth" of the patient's prior medical records, to ask about the patient's pain levels in activities of daily living, and to indicate whether they need a consultation with a pain management specialist. (*Id.*). Any new MWAP requests from this process were to be sent to then Deputy CMO Dr. Moores, rather than to the assigned RMD. (*Id.*).

### E.  The December 23, 2022 Bench Decision

On December 23, 2022, the District Court issued a bench decision addressing both Dr. Moores' Rule 12(b)(1) motion and Plaintiffs' motion for a preliminary injunction, concluding that Plaintiffs had asserted ongoing constitutional violations because, in its view, the "updated facts and arguments" that Plaintiffs included in their motion papers were "evidence of the ongoing nature of the allegations contained in the second amended complaint." (A38652-38653).  The District Court further concluded that an evidentiary hearing was necessary to determine whether a preliminary injunction was warranted given the parties' conflicting arguments as to whether Plaintiffs had established a likelihood of irreparable injury. (A38654).

The District Court then confusingly reversed the burden of proof on Plaintiffs' motion and concluded that Dr. Moores, the *non-moving* party, bore the initial burden at the hearing to disprove the existence of ongoing constitutional violations from the repealed MWAP Policy, and that Plaintiffs, the moving parties, bore the burden only to rebut the showing, if Dr. Moores could make one, that the constitutional violations complained of had ceased. (A38668-38670).

### F.  The February 2023 Evidentiary Hearing

At the hearing, both Dr. Moores and Dr. Kahn, DOCCS' Deputy CMO, testified that there is no policy, custom, or practice at DOCCS that prohibits PCPs from prescribing their choice of pain medication based on the patient's

individualized circumstances. (A38906, A38952, A38990; *see also* A39152-A39177). Dr. Moores explained that DOCCS' rescission of the MWAP Policy eliminated any future risk of providers being unable to use their individualized medical judgment to prescribe pain medication, as they no longer had to request approval from the RMDs to prescribe MWAP medications. (A38824). The rescission of the MWAP Policy removed RMDs entirely from the prescription of pain medication within DOCCS' facilities. (A38828).

Dr. Moores also testified that although Policy 1.24A initially permitted RMDs to review requests for non-formulary medications,[5] she conducted an audit and then modified Policy 1.24A to ensure that RMDs were no longer part of the non-formulary review process in any capacity. (A38832-38834, A38854; *see also* A39301-39303).

Dr. Moores also explained that Policy 1.24A created additional administrative tools to track care for chronic pain patients. These include the use of "code 338" to signify a chronic pain patient on the Medical Problems List, a database which tracks a patient's pain management history and the frequency of pain management appointments. (A38885). Policy 1.24A also requires patients with Code 338 to be seen every 90 days and to receive an annual evaluation. (A38841-A38845). Even

---

[5] Non-formulary medications are those that are not kept in stock on site at a DOCCS facility. (A31290, ¶ 26). The majority of MWAP medications are kept on formulary. (A38831-A38832, A38952).

without a 338 code, however, both Dr. Moores and Dr. Khan confirmed that pain patients are still treated for their conditions through sick call requests, which are triaged by medical personnel and are addressed immediately, if emergent. (A38826, A38829-A38830, A38841-38842, A38885, A38951).

Policy 1.24A also permits PCPs to order specialty pain consults for a patient, and vests PCPs with the ultimate medical judgment to follow the recommendations of the specialist. (A38836-38841, A38953, A39301-A39302). RMDs have no authority over a PCP's decision to follow a specialist's recommendation or prescribe a different course of treatment. (A38841).

Finally, Dr. Moores testified that DOCCS' senior utilization review nurse unit ("SURN") had begun auditing facilities statewide to ensure compliance with Policy 1.24A. (A38847).  Dr. Kahn and Dr. Moores also regularly audit facilities for compliance with Policy 1.24A, reviewing specifically the process for prescription of non-formulary medications and specialty referrals. (A38959-38960).  In doing so, Dr. Kahn, who confers with PCPs daily, has never encountered any PCPs who have indicated that their pain treatment options are limited by the MWAP Policy or because they were directed not to prescribe MWAP drugs. (A38961).

In response, Plaintiffs offered the testimony of seven incarcerated individuals and two DOCCS' medical providers, including:

(1) *Aaron Dockery*, who was taking his preferred medication, Neurontin, at the time of the hearing and testified that it effectively treated his pain; Mr. Dockery was continuously treated with Neurontin after the MWAP Policy was rescinded except for a short period in December 2022 when he refused a "mouth check" at the medication line. (A38909-38910, A38917-38919, A38924-38926).

(2) *Claudio Johnson*, who was taking Neurontin, Celebrex, and self-carry medications for pain at the time of the hearing. (A39078-39080).  While Mr. Johnson's Neurontin prescription was disrupted between August and October 2021 while he was at Woodbourne Correctional Facility (A39075, A39079), his provider, Dr. Ruiz, had made a medical decision not to prescribe the medication due to his high "INR levels," which increased his risk for blood clots (A11212-11213, A11218; ECF Case No. 1:19-cv-08173 Dkt. Nos. 306, 306-1).

(3) *Mali Wilkerson*, who testified that he did not receive MS Contin medication for nine days in the spring of 2022 at Marcy Correctional Facility (A39063), although his medical records suggest that the period lasted only three days from May 20 and May 23, 2022.  During this period, Mr. Wilkerson was prescribed 600 milligrams of Ibuprofen and 650 milligrams of Tylenol.

(A38466). Mr. Wilkerson did not testify that his pain worsened when he was off MS Contin. (A39063-39064).[6]

(4) **Felipe Rivera-Cruz**, whose medication of choice, Lyrica, was discontinued in 2015, long *before* the MWAP policy was in place. Mr. Rivera-Cruz had never heard of the MWAP Policy, had *not* communicated to his PCP, Dr. Win, that he believed Lyrica effectively treated his pain; he admitted that Dr. Win never denied him Lyrica. (A39109-39110, A39112-39114, A39122-39125).

(5) **Julio Moronta**, who was prescribed Neurontin for approximately one year to treat back pain (A39133, A39142) before it was discontinued sometime between 2013 and 2016, *before* the MWAP Policy's adoption. (A39137, A39142). Thereafter, DOCCS providers tried several different medications to treat his pain. (A3915-39136). After MWAP was rescinded, he received pain injections, which would give him "two or three months of relief." (A39138-39139). At the time of the hearing, he was on "many medications" including Cymbalta, an anti-depressant used to treat pain. (A39140, A39144-39145; A38807-38808).

---

[6] Mr. Wilkerson was released from DOCCS on February 16, 2023 and Mr. Dockery was released the week of February 27, 2023, mooting their claims for injunctive relief. *See, e.g., Hallett v. New York State Dept. of Correctional Services*, 109 F. Supp. 2d 190, 196 (S.D.N.Y. 2000).

(6) **Rashid Rahman,** who was prescribed Ultram for back and neck pain until the MWAP Policy was adopted.  After MWAP was rescinded, Dr. Win referred him to a pain specialist who recommended a cervical epidural steroid and that Dr. Win consider prescribing Ultram. Dr. Win *agreed* to proscribe Ultram, but that itbe taken in the infirmary, under observation, but Mr. Rahman refused. (A39190-39191, A39193-39194; A34129). Dr. Win sent Mr. Rahman for other procedures recommended by the specialist, including cervical spine injections. (A39164). Mr. Rahman refused the injections to treat his back pain in December 2021. (A39167, A39176; A39194; A34130). Mr. Rahman also refused a pain management consultation in November 2022. (A39195).

(7) **Mark Daniels** testified that after MWAP was rescinded, he was seen by a pain specialist in June and August 2021. (A39202). The specialist recommended cervical epidural steroid injections and that pain medications be considered as possible additional treatment. (A31780, A31804, A31807). After refusing the injections initially, he received them in March 2022. (A31786, A31774). Mr. Daniels' medical records show that while MWAP was in place, he was approved to receive Neurontin, but he repeatedly refused the medication, claiming it was ineffective. (A3875-3885). In January 2022,

13

specialists again recommended that Mr. Daniels received epidural injections to treat his pain. (A31780).

(8) **_Dr. Hlape Win_** testified that he is aware that MWAP was repealed and that treating physicians "don't need that approval anymore" from an RMD. (A39152, A39177). As a result, Dr. Win admitted that nothing prevents him from exercising his own independent clinical judgment. (A39177-39178).

(9) **_Nurse Practitioner Amy Ferguson_** testified that the MWAP Policy played no role in her decision to temporarily discontinue Mr. Dockery's Neurontin prescription in 2022 when he refused a "mouth check," that she is no longer following MWAP, that she is not aware of anyone in her facility that is still following it, and that DOCCS is no longer following it. (A39033).

## G. <u>The Class Certification Decision</u>

By Opinion and Order dated March 31, 2023, the District Court denied certification of a liability class for lack of standing and granted certification of an injunctive class under F.R.C.P. 23(b)(2). The District Court accepted Plaintiffs' definition of an injunctive class, consisting of all incarcerated individuals suffering "from chronic pain or neuropathies" that require "individualized assessments of medical need for treatment with MWAP medications," and held that each of the Rule 23(a) prerequisites had been satisfied. The Court further held that certification under F.R.C.P. 23(b)(2) was appropriate because, based on the motion papers and

testimony at the February hearing, "Plaintiffs have shown ongoing constitutional violations" and thus "have demonstrated a likelihood of imminent future harm across all putative class members, making it possible for a single injunction to provide relief to each class member." (A39387).

### H. The Preliminary Injunction Decision

In a separate Opinion and Order also dated March 31, 2023, the District Court granted Plaintiffs' motion for a preliminary injunction and denied Dr. Moores' F.R.C.P. 12(b)(1) Motion to Dismiss, relying in part on the evidence presented at the February hearing. The District Court accepted Plaintiffs' concession that DOCCS' rescission of the MWAP Policy and removal of the RMDs from the medication process mooted any claims for injunctive relief based on Plaintiffs' first cause of action. This effectively dismissed the only claim that Plaintiffs made against any official capacity defendant, and the only claim stated against Dr. Moores. (A39352-39353). Although the District Court found that Plaintiffs had *not* asserted a *Monell* claim against Dr. Moores, it nevertheless concluded that Dr. Moores could still be sued in her official capacity based on her responsibility for the actions of her subordinates named in the second cause of action, essentially under a respondeat superior theory. (A39356-39357).[7]

---

[7] After the Court's decision, Plaintiffs sought to amend the SAC to add Dr. Moores as a defendant, in her official capacity, in the Second Cause of Action, as well as an order seeking severance of

The District Court identified a total of seven incarcerated individuals (out of the approximately 32,000 inmates being treated across DOCCS' 44 facilities) that, in its view, had not received effective pain treatment from their *specific individual medical providers*, none of whom were named as defendants in the second cause of action. (A39318-39348). The Court, however, did not hold that any of these seven witnesses were denied effective pain treatment due to the MWAP Policy or any specific DOCCS' custom and practice resulting from the MWAP Policy.

The District Court reserved decision on the terms of the preliminary injunction. (A39371). Because the Prison Litigation Reform Act ("PLRA") dictates that a preliminary injunction automatically expires after 90 days unless a merits determination is made, Plaintiffs asserted that the yet-entered preliminary injunction would need to be converted into a permanent injunction. (A39393-39394); *see also* 18 U.S.C. § 3626(a)(2).[8] Following the parties' submissions (A39395-39399; A39419-39483; A39490-39503), the District Court entered the terms of the preliminary injunction with no less than eight separate sub-parts dictating the administration of DOCCS' health policies for chronic pain patients, largely

each individually named defendant. (A39544-39562). Plaintiffs never pursued this amendment, and the District Court never granted the request. (A39577-39580).

[8] The individual provider defendants raised due process and estoppel concerns that if the merits were to be decided at a trial on the permanent injunction (prior to their respective trials on the merits of the claims against *them*) they would be prejudiced in their defense of the second cause of action. (A39596-39597, A39599). The Court therefore severed the claims against each individually named defendant into separate actions, leaving no provider defendants named in the second cause of action. (A39612-39615).

reflecting DOCCS' own Policy 1.24A. (A39563-39576). Given the PLRA's 90-day automatic expiration, the Court ordered the parties to either: (1) stipulate to extend the Order an additional 90 days; or (2) move forward with an evidentiary hearing to determine Plaintiffs' entitlement to a permanent injunction. (A39575).

By Order dated June 20, 2023, and over Dr. Moores' objections (A39607-39609), the District Court incorporated the preliminary injunction record into the permanent injunction trial record, noting that "while the standards for granting relief differ . . . any questions as to the admissibility of the evidence remains the same." (A39610-39611).

## I.  <u>The September 2023 Trial.</u>

The District Court held a four-day trial on the merits to determine whether the preliminary injunction would be converted into a permanent injunction.

### a.  Plaintiffs' Witnesses.

**(1)** ***Dr. Adam Carinci.***  Plaintiffs called Dr. Adam Carinci, whom they retained to review how the MWAP Policy was applied to the "named plaintiffs in the case," and to "ascertain whether that was consistent with the standard of care" (A39918), even though Dr. Carinci previously testified in a different case that "there's really no standards of care for treatment of really any pain conditions." (A40008-40009). Dr. Carinci never spoke to the named injunctive class representatives, Rashid Rahman, Felipe Rivera-Cruz, and Mark Daniels, among

17

them (A40026-40028). Nor did he speak to any of their medical providers to understand the "reasons behind any decisions" concerning their care. (A40028). In fact, Dr. Carinci did not speak to any DOCCS PCPs or RMDs at all, or review any of their testimony. (A40028-40029). Of the twelve purported "class members" who testified at trial, Dr. Carinci only opined about two—Mr. Daniels and Mr. Vasquez. (A813). Dr. Carinci did not physically examine either patient, choosing instead to base his conclusions on their old medical records from when the MWAP Policy was still in effect. (A819; A842).

Dr. Carinci testified that pain management is highly individualized: "no two patients are the same" and "no two patients will respond in the same way to a given medication." (A39932). The objective of pain management is not to completely cure the patient's pain, nor is it possible to get the pain "score" to zero. (A39967). Dr. Carinci acknowledged that a patient is not entitled to a particular medication based on personal preference, and that "just because a patient tells [him] it worked for their pain doesn't necessarily mean that it's right for them." (A40048). Dr. Carinci testified that he also recommends nonmedication alternatives to his pain patients, similar to those that nearly every trial witness testified to receiving, including: physical therapy, chiropractic therapy, TENS units, injections, and other procedures to help treat their pain. (A40049).

18

Dr. Carinci also conceded that the various types of medications that had been prescribed to the trial witnesses were appropriate to treat pain. Notably, he testified that (1) Baclofen treats muscle pain (A39957); (2) Lyrica is more "potent" than Gabapentin to treat pain (A39956); (3) Flexeril is effective for pain management (A39958); (4) Elavil (amitriptyline) is a "first line medication" for chronic pain that can lessen pain severity and improve pain control (A40051); (5) Tegretol (carbamazepine) treats nerve pain (A40047); (6) Cymbalta may be used for some patients with chronic pain (A40051); and (7) Suboxone (buprenorphine) is frequently used and works well to treat pain. (A40046-40047). Dr. Carinci also acknowledged prescribing suboxone/buprenorphine to his own pain patients, including those with neuropathic pain. (A40047, A40055).

Dr. Carinci failed to offer any generally accepted or objective data that Neurontin (gabapentin) and Lyrica (pregabalin), which are classified as gabapentinoids, are scientifically proven to effectively treat any of Plaintiffs' pain conditions. In fact, a reliable scientific article that Dr. Carinci adopted as part of his report (A40036-40037; A41128-A41131) established, based on a randomized clinical trial of 421 participants, that gabapentinoids like Neurontin and Lyrica are *not* effective for treating pain associated diabetic neuropathy, low back pain, radiculopathy, or sciatica. (A41128-41131; A40040).

Most notably, both Dr. Carinci and the scientific study he relied upon acknowledged that evidence of misuse of gabapentinoids is "accumulating" and that law enforcement reports have corroborated "growing diversion activity and street value for gabapentinoids." (A41128-A41131). Indeed, Dr. Carinci admitted both gabapentin and Lyrica *do* have the potential to be addictive and potentially abused, especially if the patient has "a history of addiction." (A40034-40035). Accordingly, Dr. Carinci opined that treating patients with active addiction with medications with abuse potential is not advised. (A40048).

Notably, Dr. Carinci was not asked to opine on *any* DOCCS patient's care after February 8, 2021(A40013), and never reviewed any medical records of *any* patients after March 5, 2022. (A40012). Dr. Carinci did not opine at trial, nor could he, that any class members were continuing to receive inadequate care *after* the MWAP Policy's repeal. Nor could he render any opinion on whether they suffered any harm after the date of his report.  (A40013, A40004-40005).

Dr. Carinci's only criticism of DOCCS' medical care under the MWAP Policy was that the RMDs (now powerless) had made treatment decisions about MWAP medications without always having the proper medical records before them. (A40011-40012). Dr. Carinci, however, was unaware of Policy 1.24A, which rescinded the MWAP Policy, and he confirmed that he did not evaluate any medical

care under Policy 1.24A. His only opinions related to the rescinded MWAP Policy. (A40002).

In addition to Dr. Carinci, Plaintiffs called the following class members at trial:

**(2)** *Richard Vasquez*, a former drug dealer who suffers from hip and back pain (A39827), testified that he was briefly prescribed Neurontin at the Walsh Regional Medical Unit in 2021 following surgery. (A39819, A39836). He further testified that upon transfer to Mid-State Correctional Facility in March 2022, NP Ferguson told him that Mid-State was "not allowed to give" out Neurontin. (A39821). However, his medical records show he requested to discontinue Neurontin when he arrived at Mid-State, opting instead for a self-carry medication. (A37080, A37114). At trial, Mr. Vasquez admitted that NP Ferguson was trying to help him when she attempted to prescribe him a self-carry medication instead of Neurontin. (A39848). Since May 2023, Mr. Vasquez's pain management regimen has included Baclofen, a former MWAP medication recommended by a pain management specialist, Tegretol, Tylenol, and ibuprofen. (A39832-A39836, A39838-A39845).

**(3)** *Rafael Montanez*, a former heroin abuser (A39864), took Tramadol and Neurontin for back pain beginning in 2011, but was weaned off both medications in 2013, before the MWAP Policy was adopted. (A39860). Mr.

Montanez then received various other treatments for his back pain, including Tylenol and naproxen, and was sent for x-rays and MRIs. (A39855, A39860). In April 2023, while at Mid-State Correctional Facility, he was prescribed ibuprofen, a back brace, and a TENS unit, and was directed to do back exercises, but Mr. Montanez only did them once. (A39863-39864). Mr. Montanez admitted that the back brace and the TENS unit provide relief (A39862). Mr. Montanez is also taking buprenorphine, a type of opioid which is used to treat both addiction and pain. (A39864, A40046-40047).

**(4)** ***Marc Confessore***, who previously abused Percocet, Xanex, and Klonopin (A40217-40218), was prescribed Neurontin for back pain in 2018, while the MWAP policy was in effect, and received it until 2019. (A40404-40206). At Bare Hill, Dr. Connolly prescribed him ibuprofen and then meloxicam. (A40215). When Mr. Confessore complained of hand tremors, Dr. Connolly referred him to a hand specialist and prescribed him Primidone, which Mr. Confessore refused. (A40215-40216). Dr. Connolly also sent Mr. Confessore for two MRIs. (A40216). In July 2023, Mr. Confessore submitted a sick call request complaining that he still had back pain. (A40213). In response, Dr. Connolly saw him the first week of August 2023. (A40213-40214). Dr. Connolly asked Mr. Confessore about his back pain and hand

tremors and prescribed Mr. Confessore Neurontin to treat both conditions. (A40214).

**(5)** *Kenneth Windley* testified that he temporarily received Percocet and Neurontin in 2015 while recovering from a surgery for spinal stenosis. (A40159). Prior to the MWAP Policy, an unidentified medical provider allegedly told him that he would no longer receive the medications due to "pain management." (A40160). In November 2022, at Midstate Correctional Facility, NP Wiggan prescribed him meloxicam, sent him for x-rays, ordered an MRI, and prescribed him back brace and leg braces, which help him walk better. (A40168, A40176-40177, A40158, A40167). In March 2023, Mr. Windley complained that meloxicam was not helping; in response, NP Wiggan prescribed him both gabapentin and Tramadol and referred him to a neurosurgeon. (A40177, A40178). He had an EMG test for his back pain and was scheduled for spinal fusion surgery. (A40178, A40180). NP Wiggan subsequently increased his dosages of gabapentin from 300 to 600 milligrams after Mr. Windley complained of some pain. (A40179). At trial, Mr. Windley had been receiving gabapentin and Tramadol for seven months, with no threat of discontinuance. (A40180).

**(6)** *Samson Burch* has a history of sciatic nerve damage and back pain and received Neurontin between 2018 and 2020 at Greene Correctional Facility.

(A40190, A40193). Mr. Burch was weaned off Neurontin and switched to Elavil while at Greene (A40194). Mr. Burch's prescription for Elavil was continued when he arrived at Adirondack in 2021. (A40199). He then complained that he was still in pain while on Elavil, so his provider, NP Wiggan, added meloxicam to his regimen and gave him a back brace. (A40195, A40200). Thereafter, he submitted a sick call request complaining that he was still in pain and that Elavil and meloxicam were not working. NP Wiggan then prescribed Mr. Burch 1200 milligrams of Neurontin. (A40198-40200).

**(7)** *Eric Lindemann* has been in DOCCS custody since 2021 for vehicular manslaughter that occurred while he was under the influence of alcohol and Neurontin. (A39745, A39763, A39764). Mr. Lindemann suffers from opioid use disorder. (A39767). He was taking Neurontin before he came into DOCCS custody for back and leg pain (A39745-39746, A39747-39749), and remained on Neurontin, with increased dosages, throughout several facility transfers through December of 2021, when he was transferred to Fishkill. (A39749-39750). There, he was told by an unidentified nurse that NP Sullivan does not prescribe Neurontin. (A39756).  He testified that NP Sullivan discontinued the Neurontin because "she does not prescribe it and she won't prescribe it." (A39757). Mr. Lindemann conceded that NP Sullivan does, in fact, prescribe

Neurontin to other inmates at Fishkill, but chose not to prescribe it to him based on her medical judgment. (A3977-39779). Instead, NP Sullivan prescribed him Cymbalta, meloxicam, acetaminophen, an analgesic balm, and a TENS unit (A39771, A39775-A39777). She also referred Mr. Lindemann to an orthopedic surgeon, who performed a successful shoulder surgery that significantly improved his pain. (A39774). Mr. Lindemann also testified he was on Suboxone, as well as Zyprexa and trazodone. (A39768). While he denies that these medications help for pain, he believed they were prescribed to treat his pain. (A39769).

**(8)** ***Miguel Tirado***, a former heroin dealer, suffers from diabetic neuropathy. (A40223, A40237). He testified that he was told by an unidentified individual at Green Haven that the State did not allow prescriptions for Neurontin. (A40227). He was transferred to Elmira for one month, where he was allegedly told that "they" would not prescribe Neurontin (A40229). In April 2022, he was transferred to Marcy and was told by an unidentified nurse—who did not have prescribing privileges and who is no longer employed at Marcy—that Neurontin is not prescribed there. (A40232-40233, A40248). Mr. Tirado, however, never asked any medical provider for any alternative to Neurontin to treat his pain. (A40250). In August 2023, Mr. Tirado was prescribed Neurontin, and testified that Neurontin is currently

25

"helping" him. (A40234-40235). Mr. Tirado also admitted that he refused to take his morning dose of Neurontin at least twice and does not wish to take that dose because he does not enjoy his interactions with the officers at the medication line. (A40247).

**(9)**    ***James Pine*** has a history of abusing opioids. (A39734). Although his Neurontin prescription was discontinued in 2017 under the MWAP Policy (A39738-39739), his provider at Green Haven, Dr. Silver, reinstated the prescription when the MWAP policy was rescinded. (A39737-39739). Upon transfer to Clinton, Mr. Pine was again prescribed Neurontin by his medical provider, NP Devlin-Varin, in December 2022. (A39729-39730). The Neurontin he has been receiving has been "*absolutely*" helping his chronic pain. (A39733). His Neurontin dosage has since been increased twice, upon his request. (A39736).

**(10)**    ***Mark Daniels*** testified that he had medications "discontinued" or "denied," but only after he told his providers that those medications were not working. (A39785-39787, A39796-39797, A39806). Mr. Daniels confirmed that he has been provided with a panoply of pain treatments and could not identify *any* medication or treatment he wants or is being denied by his medical providers. (A39804). He has received multiple surgeries (A39802-39803); participated in physical therapy and performs exercises on his own

for pain relief (A39800-39801); has seen pain management specialists and neurologists (A39801, A39802), including 15 neurosurgeons (A39802); and has been prescribed Neurontin, Cymbalta, Ultram, Percocet, Lyrica, and ibuprofen (A39799, A39803, A39804). Mr. Daniels does not like Neurontin or Lyrica (A39803-39803), and although he found Ultram to be mildly useful, he did not allege he was denied that medication. (A39799).

**(11)** *Ramal Myriee* has been incarcerated numerous times since 1999 for crimes associated with, among other things, dealing narcotics. (A39876, A39891, A39892). While in DOCCS' custody, Mr. Myriee was prescribed Neurontin, Percocet, Flexeril, aspirin, tramadol, and Cymbalta. (A39877). He still complained that "the pain was unbearable," notwithstanding this plethora of medications. (A39880). As a result, Mr. Myriee was switched off Neurontin and put on Lyrica, which he did not like. (A39880-39881) Mr. Myriee has abused heroin in prison and is currently in the MAT program for his drug addiction. (A39889). Through this program, Mr. Myriee has received Suboxone strips and a Sublocade injection, both of which contain buprenorphine, an opioid that treats pain and addiction. (A39897). Upon request, Mr. Myriee was prescribed Cymbalta (A39898, A39901), a valid pain treatment for chronic pain (A40051), which he agrees "works for diabetic neuropathy," which he suffers from. (A39899).

27

**(12)** *Anthony Jackson* is a former heroin addict and claims to suffer from chronic back pain. (A40263, A40265, A40283). In 2015, he was on Elavil and Neurontin, but his pain worsened and was tapered off Neurontin prior to the MWAP Policy's enactment. (*Id.*; A40268-40269). As an alternative to Neurontin, he was prescribed ibuprofen, aspirin, and Flexeril, an "efficacious" muscle relaxer for pain. (A40270, A39957-39958). Mr. Jackson was also prescribed Elavil. (A40271, A40051). After complaining about the Elavil, PCPs then prescribed Cymbalta, another reasonable treatment for chronic pain, which he is still taking because it provides some relief (A40051, A40271, A40282-40283). Mr. Jackson has received a cane, which has helped him ambulate; has seen pain specialists; received cortisone shots to control his pain; and has been offered physical therapy. (A40274, A40279-40280).

**(13)** *Tina Vivenzio* is a former heroin addict who had previously obtained Suboxone through prison bartering, but preferred Neurontin over opiates to treat her chronic pain symptoms. (A39707-39708). At the time of trial, Ms. Vivenzio had been taking Neurontin for at least one year. (A39693, A39703, A39717). NP Bode had provided her with various chronic pain treatments, upon request, without issue; she had received a TENS unit, wrist braces, knee braces, heat sources, and ice. (A39709, A39711-39712). She is currently taking Baclofen, Indocin, Amlodipine, Metformin, Synthroid, Omeprazole,

28

Vitamins C and D, Clonidine, Cetirizine, Atorvastatin, Excedrin, two inhalers, antacids, Effexor, Trileptal, and ReQuip. (A39713-39714).

**(14) & (15)** ***Dr. Susan Mueller and Dr. David Dinello*** Dr. Mueller is a regional medical director with DOCCS, holding the title of Clinical Physician III. (A40060). Dr. Dinello was a regional medical director with DOCCS until 2021, but is no longer employed by DOCCS (A40136, A40398). Neither have *any* of the responsibilities they had during the period in which the MWAP Policy was effective. They do not treat DOCCS' patients, do not review MWAP forms, and have no authority to approve or deny prescriptions. (A40127-40129, A40136, A40398). Dr. Dinello, an addiction specialist, was a proponent of the MWAP policy prior to and during its implementation, as he recognized the increased challenges of prescribing narcotics to incarcerated individuals and prisons where there is a "a higher concentration of people that have serious drug addiction problems." (A40142, A40143).

### b. Defendant's Witness

***Dr. Carol Moores*** testified that DOCCS has no current policies, customs, or practices unique to any of the medications that were formerly governed by the MWAP Policy that have the effect of limiting a provider's ability to prescribe those medications. (A40260-40262, A40292-40293). RMDs still have no oversight on a

provider's ability to prescribe medications. (A40295). Of the 44 DOCCS facilities, Dr. Moores testified that *no* facilities are currently refusing to prescribe any of the medications previously governed by the MWAP Policy, including tramadol (Ultram), Lyrica (pregabalin), Cymbalta (duloxetine), Neurontin (gabapentin). (A40291-40293). Every DOCCS facility is presently prescribing gabapentin, which is "pretty common" in DOCCS currently, and that "at least a few hundred" patients are currently on that medication. (A40293). Gabapentin is available in both liquid and pill form; a provider may consider liquid form because "they've been having a lot of diversion issues" with gabapentin.  (A40305).

Dr. Moores and Dr. Khan continue to audit nonformulary requests and specialty care referrals. (A40295).  Providers are regularly peer reviewed with an emphasis on ensuring proper administration of chronic care medicine, such that Dr. Moores and her colleagues can review and address any standard of care issues brought to their attention. (A40297-40298). Issues with providers are also brought to Dr. Moores' attention by facility Superintendents or executive team members, through SURN audits, letters from patients, or from Dr. Moores' own regular records review. (A40299). In 2023, Dr. Moores learned of *only two issues* specifically involving the administration of chronic pain medication, neither of which related to the rescinded MWAP Policy, and both of which she promptly responded to with numerous corrective actions. (A40300-40301, A40303-40304, A40340-40342).

30

Dr. Moores testified that she had begun to evaluate the list of patients still in DOCCS' custody who previously had MWAP medications discontinued under the MWAP regime.  (A40330-40334). Although not complete, her review has revealed that some are receiving those medications, some were requests for acute or short-term medications as opposed to chronic care, and others were inconclusive. (A40331).

Dr. Moores also testified regarding DOCCS' efforts to comply with the Preliminary Injunction Order. To identify chronic pain patients who require 338 medical problems list coding, eight staff members are assigned to manually review the medical problems list of every incarcerated individual (32,000 total); Dr. Moores directed that if there appeared to be a diagnosis listed that could potentially cause chronic pain, then staff should add the 338 code. (A40306-40308). Dr. Moores' staff was able to review one-third of the medical problems lists, and that review continues; as a result, the number of total 338 entries has increased from approximately 850 to 2500.  (A40308-40310).

DOCCS also proceeded with the required individualized annual pain assessments.  (A40310-A40312), A40314). DOCCS' nursing staff provided feedback to Dr. Moores, however, that some of the pain patients stated, "I don't see why you're having me come in for this" . . . and, "I see you all the time anyway." (A40314-40315). Moreover, several pain assessments have resulted in no change to

the pain plan because those providers were already seeing the patient. (A40315). Dr. Moores testified that the providers are concerned about the pain assessments because "it's an additional appointment" and if the patient is already regularly seen and discussing their plan with their provider, it adds unnecessary workload "and it's not going to produce any positive effect." (A40315-40316). Dr. Moores testified that she agrees with this concern because for those providers who communicate with their patient, it adds unnecessary work; for other providers, completing a new form does not change their evaluation and treatment for the patient's chronic pain. (A40316-40317). Dr. Moores also explained that the added workload of the additional appointment will increase with more 338 coding evaluations taking place, which will result in the delay of care of patients with diabetes or hypertension, as an example. (A40317).

Finally, Dr. Moores has ensured that all medical staff are trained on Policy 1.24A, and as a solution to issues in continuity of medications upon transfer to new facilities, Dr. Moores has undertaken to put pharmacies back into facilities, rather than relying on remote, centralized pharmacies. (A40340-40342).

### J. **The Decision on the Merits**

By Opinion and Order dated October 31, 2023, the Court held that Plaintiffs had suffered concrete injury for standing purposes based on the testimony of Richard Vasquez and Ramal Myriee, who "remain without effective medication today."

(A41197). The Court held that Plaintiffs established an Eighth Amendment deliberate indifference violation and irreparable harm, relying solely on the treatment of Ramal Myriee and Richard Vasquez to establish the requisite subjective mens rea of Dr. Ruiz, PA Switz and NP Schrader, none of whom testified. (A41197-A41205). The Court also found that policies and customs still exist pursuant to which DOCCS' providers fail to provide inmates with reasonable pain medication. For this finding, the Court relied on the testimony of Richard Vasquez and Anthony Jackson as demonstrative that the rescinded MWAP policy "is responsible for ongoing violation . . . because its impacts remain in place despite its [] [recission]." (A41206). Finally, the Court held the balance of equities tips in Plaintiffs' favor and that a permanent injunction would be in the public interest because "remedying the constitutional violations in DOCCS' pain management practices outweighs the administrative challenges [to] DOCCS." (A41209).

### K. **The Permanent Injunction**

The District Court entered the terms of the Permanent Injunction on November 22, 2023. (A41227-41242). The terms direct that Dr. Moores, or her designee, and any succeeding Chief Medical Officer, shall: (1) ensure that Policy 1.24A is followed by all medical personnel; (2) train all DOCCS medical personnel on Policy 1.24A within 45 days of entry of the Order; (3) develop and implement a plan to train new medical providers hired or rehired on Policy 1.24A within 60 days

of entry of the Order, and ensure that new hires are trained within 60 days of their start date; (4) identify all patients in DOCCS' custody who suffer from chronic pain and add Code 338 to their medical problems list within one year of entry of the Order; (5) develop and implement a system for identifying all patients who transfer into DOCCS custody and suffer from chronic pain and ensure that Code 338 is added to their medical problem list within 60 days of entry of the Order; (6) ensure that each patient given Code 338 receives an individualized assessment of that patient's chronic pain management needs by their provider within 180 days of entry of the Order; (7) ensure that each patient previously coded 338 receives an individualized assessment of that patient's chronic pain management needs by their provider within 180 days of entry of the Order; (8) use best efforts to identify and prioritize Class Members whose MWAP medications were discontinued between June 1, 2017 and November 1, 2023 for any necessary 338 coding "and/or" an individualized assessment within one year of entry of the Order; and further, to produce to Plaintiffs documentation every 30 days of its progress in completing the individualized assessments details in paragraphs 6, 7 and 8 (A41236-A41242).

## L. **The Fee Award**

Plaintiffs applied for an award of fees and costs pursuant to 42 U.S.C. § 1988 in the amount of $3,819,232.24. (A41243-A44835; ECF Case No. 1:19-cv-08173 Dkt. No. 821). The District Court held that Plaintiffs' class counsel was entitled to

nearly the full amount of attorney's fees and costs they sought, finding that a proper claim was made against Dr. Moores in her official capacity, and that Plaintiffs were prevailing parties under § 1988.  (A45104-45129). The District Court did, however, deduct fees associated with overtly offensive and inappropriate time entries authored and filed on the federal court docket by Class Counsel.  (A45122; A44841-A44846; SPA211).

The District Court entered judgment, on March 26, 2024, in favor of Class counsel in the amount of $3,796,902.82.  (A45131-45132).

## SUMMARY OF THE ARGUMENT

At the height of the opioid epidemic, and with increasing evidence that prescription medications in DOCCS facilities were being abused and diverted for illicit use, DOCCS adopted the MWAP Policy to regulate the process for prescribing medications with abuse potential to patients in DOCCS facilities. The intent of the policy was laudable—to ensure that potent and addictive prescription drugs were not being abused or diverted in the New York prison system—but its implementation was ineffective. Only four RMDs were assigned final authority to review and approve all prescriptions of MWAP drugs, but often they were not given enough individualized patient information to do so. Thus, Plaintiffs' pleaded theory of liability was that that the implementation of the MWAP Policy, through the RMD approval process, resulted in the unwarranted denial of their pain medications.

In 2021, however, DOCCS rescinded the policy, removed the RMDS from the prescription process, and vested complete authority back into the hands of the facility-based providers who treat pain patients on a regular basis to make individualized medical judgments for the treatment of chronic pain conditions, including the prescription of former MWAP drugs. When Dr. Moores took over as DOCCS' CMO, she continued to drive these changes, conducting audits and taking corrective action to ensure that they were implemented correctly.

36

Without amending their operative complaint to recognize this policy change, or to include any factual allegations post-dating 2019, Plaintiffs then shifted the focus of their case away from the MWAP Policy. They *repeatedly* conceded that they were not pursuing a *Monell* theory of liability, which imposes stringent requirements of proof for claims against government entities and official capacity defendants. Plaintiffs also conceded that their challenge to the MWAP Policy, as asserted in their First Claim for Relief, was moot. Although the District Court adopted Plaintiffs' concession that the First Claim for Relief was moot, it committed clear legal error when it allowed Plaintiffs to proceed against Dr. Moores, in her official capacity, on a de facto theory of respondeat superior liability. It concluded that Dr. Moores could be held responsible for the individual actions of her subordinates, a small group of medical providers that Plaintiffs sued personally in their Second Claim for Relief, for deliberate indifference under the Eighth Amendment.  The District Court committed clear error in violating *Monell* and general principles of due process, by making Dr. Moores an unnamed defendant to this claim, which was not pled against her, forcing her to answer for the individual actions of her subordinates.

Plaintiffs thus did not try to prove a *Monell* claim, but instead attempted to establish that a few medical providers acted with deliberate indifference when they chose not to prescribe certain patients their preferred pain medications. Plaintiffs'

proof failed even in this regard, as they did not offer a single medical record into evidence at trial, did not show that their current medication regimens were medically unreasonable, and did not offer any evidence that their individual medical providers acted with subjective culpability to the level of criminal recklessness. At most, they established a disagreement with their direct medical providers as to which medications they should receive, which does not amount to an Eighth Amendment violation.  Thus, not only did Plaintiffs fail to satisfy the stringent proof requirements of a *Monell* claim, which was the only way they could have succeed on any official capacity theory against Dr. Moores, but they also failed to establish that any DOCCS' medical provider acted with deliberate indifference.

Even setting aside the glaring substantive holes on the merits of Plaintiffs' claims, they also utterly failed to establish they were suffering any *ongoing* harm. Plaintiffs' medical expert testified that he could not offer an opinion as to the adequacy of the medical care that any class members were receiving at the time of trial, as he had not reviewed any of their medical records *since 2021*, and his report was prepared in early 2022.  Further, every class member that testified in this case had been receiving active pain treatment, with a robust medication regimen, prior to and at the time of their testimony. Most of these class members were receiving their preferred pain medications at the time of trial and could only cite past instances when they felt that they were deprived of those medications.

Overlooking this evidence, the District Court erroneously held that DOCCS, as an institution, was deliberately indifferent to the medical care of its chronic pain patients, and issued an overbroad and intrusive state-wide injunction dictating the administration of medical treatment across 44 DOCCS facilities. This extraordinary relief violated the Prison Litigation Reform Act, was granted based on a multitude of substantive and procedural errors, and should be reversed along with the Court's judgment certifying Plaintiffs' injunctive class, and its award of attorney fees to Plaintiff.

## **ARGUMENT**

## I. THE DISTRICT COURT ERRED IN GRANTING AN INJUNCTION AGAINST DR. MOORES.

A trial court's discretion to grant the "extraordinary and powerful" remedy of a preliminary injunction is "not boundless." *Reynolds v. Giuliani*, 506 F.3d 183, 197 (2d Cir. 2007). The Court's discretion should be exercised "sparingly and cautiously," is "subject to thorough appellate review," and may be "overturned it if is predicated, as here, on legal error." (*Id.* at 197, 198). This is particularly true where the injunctive relief interferes with a State's executive functions, as the State should be granted "the widest latitude on the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-379 (2007) (internal quotation marks and citations omitted).

39

To obtain permanent injunctive relief,[9] Plaintiffs were required to demonstrate (1) *actual* success on the merits of their claims, (2) irreparable harm and the absence of an adequate remedy at law, and (3) that the balancing of the equities tipped in their favor. *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). The proof fell short of this showing.

**A. Plaintiffs failed to establish their claims on the merits.**

> **1. The District Court erroneously rejected the long-settled *Monell* test and instead held Dr. Moores liable in her official capacity under a *respondeat superior* theory.**

A plaintiff seeking to hold a government entity liable in a § 1983 case *must* prove a constitutional injury resulting from the "execution of a government's policy or custom." *Monell v. Dept. of Soc. Serv. of the City of N. Y.*, 436 U.S. 658, 694 (1978). In *Monell*, the Supreme Court specifically rejected the assertion that a government official can be held vicariously liable "under § 1983 for an injury inflicted solely by its employees or agents." (*Id.*); *see Agosto v. N. Y. C. Dept. of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020). Liability will thus only be imposed where "*the governmental body itself* subjects a person to a deprivation of rights or causes a

---

[9] Since the District Court incorporated the preliminary injunction hearing evidence into the trial record (A39610-39611), this section will analyze relevant portions of the preliminary injunction hearing proof to determine whether plaintiffs' demonstrated entitlement to permanent injunctive relief.

person to be subjected to such a deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis added; quotation marks and citations omitted).

*Monell* unquestionably applies to official capacity suits against DOCCS employees. *See, e.g., Smith v. Martuscello*, 602 Fed. Appx. 550, 551 (2d Cir. 2015) (applying *Monell* to official capacity claim against a DOCCS employee); *Reynolds*, 506 F.3d at 192. Contrary to the District Court's holding (A39356-A39395), "*Monell* draws no distinction between injunctive and other forms of relief" and thus applies "regardless of the category of relief sought." *Reynolds*, 506 F.3d at 191; *see Los Angeles County v. Humphries*, 562 U.S. 29, 36-37 (2010).

A plaintiff seeking to impose § 1983 liability upon an official capacity defendant for injunctive relief must meet *Monell*'s "rigorous requirements of culpability and causation." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 415 (1997). The plaintiff must show that the government entity, "through its *deliberate* conduct," was the "moving force behind the injury alleged," that the conduct was "taken with the requisite degree of culpability," and that there was "a direct causal link" between the state's action and the constitutional deprivation. (*Id.* at 404) (quotation marks omitted; emphasis in original); *see also Agosto*, 982 F.3d at 98; *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012), *cert. denied*, 571 U.S. 940 (2013).

Plaintiffs must prove that a custom, policy, or usage of the government entity caused the constitutional deprivation at issue. *See Jones*, 691 F.3d at 81. Isolated conduct by non-policymaking employees is insufficient. *See id.*; *see also Feaster v. City of New York*, No. 20-1122, 2021 WL 4597766, at *1 (2d Cir. 2021); *Cipolloni v. City of New York*, 758 Fed. Appx. 76, 78 (2d Cir. 2018). In the absence of a facial challenge or an unlawful decision by an official with final policymaking authority, government liability may be established with evidence of unconstitutional conduct by subordinate employees so "persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. In such a "widespread practices" case, however, the plaintiff must prove *deliberate indifference* on the government entity's part, "a stringent standard of fault." *Id.*; *accord Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018). The plaintiff must show that government officials made a conscious choice to allow the challenged conduct and were not merely negligent. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy"); *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) ("[t]he operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of a conscious choice and not mere negligence) (internal quotation marks and citations omitted).

To show that the government made a "conscious choice" in a "widespread practices" case, the plaintiff must demonstrate "sufficient instances of tolerant awareness" by officials to support an inference that they acquiesced to the challenged conduct. *Lucente v. County of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020) (internal quotation marks and citation omitted); *see Jones*, 691 F.3d at 82; *Davis v. City of New York*, 75 Fed. Appx. 827, 829 (2d Cir. 2003). Plaintiffs must then also prove that the specific constitutional deprivation occurred *pursuant* to the policy or custom. *See Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). Thus, the individual who performed the unconstitutional act must have been acting to "implement rather than frustrate the government's policy." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks and citation omitted), *cert. denied*, 558 U.S. 933 (2009).

Plaintiffs' *only* path to establishing liability against Dr. Moores, the official capacity defendant, was through *Monell*. Plaintiffs admitted, however, they never even *attempted* to satisfy *Monell*. Rather, Plaintiffs—either ignoring or failing to understand the established law—declared that their claim against Dr. Moores was "not a *Monell* claim, because *Monell* claims are for damages. This is a claim for injunctive relief, it's not a *Monell* claim by definition." (ECF Case No. 1:19-cv-08173 Dkt. No. 642, p. 20).  Plaintiffs conceded that they "did not allege a *Monell* claim against any DOCCS official in his/her official capacity – **quite intentionally**."

43

(*Id.*; ECF Case No. 1:19-cv-08173 Dkt. No. 481, p. 14) (emphasis added).  Thus, Plaintiffs claimed that they "did not have to show that DOCCS was the moving force behind anything" (ECF Case No. 1:19-cv-08173 Dkt. No. 481, p. 12), and could establish their right to injunctive relief against Dr. Moores simply by showing that, as DOCCS' CMO, she had a direct connection to, or responsibility for, the constitutional violations alleged by Plaintiffs. (*Id.* at p. 14).

The District Court erroneously adopted Plaintiffs' arguments, concluding that Plaintiffs did not need to plead or prove a *Monell* claim in their official capacity suit against Dr. Moores:

> Plaintiffs have not asserted a Monell claim against Dr. Moores.  Instead, Plaintiffs seek injunctive relief related to DOCCS providers' unjustified denial and discontinuation of MWAP medications, as described in Plaintiffs' second claim for relief . . . Because Dr. Moores has responsibility as DOCCS' CMO for the alleged illegal action of her subordinates, Plaintiffs may properly seek injunctive relief targeted to Dr. Moores.  If Plaintiffs can establish that the DOCCS providers continue to deny and discontinue MWAP medications without proper medical justification, then the Court may order injunctive relief remedying these harms through Dr. Moores' office.

(A39356-39357). The District Court thus held, in contravention of *Monell*, that Dr. Moores could be liable, in her official capacity, merely for the acts of her subordinates under a *respondeat superior* theory, the very theory that the Supreme Court has unmistakably rejected. Indeed, the District Court's analysis disregarded whether Dr. Moores had any level of culpability at policymaking level and failed to

consider whether Dr. Moores' subordinates were acting pursuant to a government policy, as *Monell* requires.

The Court's conclusion violated the Supreme Court's and this Circuit's well-established law holding that *Monell* applies to *all* claims against government entities, not just claims for damages. *Humphries*, 562 U.S. at 36-37. Further, the District Court itself effectively eliminated any possibility of *Monell* culpability when it held, at the preliminary injunction stage, that "Dr. Moores' evidence showed that *the MWAP Policy was replaced by Policy 1.24A*, and that Policy 1.24A was intended to address many of the shortcomings of the MWAP Policy. Dr. Moores' evidence also showed that she and her deputy, Dr. Kahn, are genuinely attempting to improve DOCCS' standard of care for its chronic pain patients." (A39352) (emphasis added). This holding precludes *Monell* liability here because it negates the possibility of establishing "constructive acquiescence," which must be proven with evidence of "sufficient instances of tolerant awareness" of unconstitutional conduct by policymakers. *Lucente*, 980 F.3d at 298 (internal quotation marks and citations omitted).

From the preliminary injunction stage onward, however, the District Court did exactly what the Supreme Court warned against—it collapsed *Monell's* "rigorous requirements" into *respondeat superior* liability. *Bd. Of Comm'rs of Bryan Cty.*, 520 U.S. at 415; *see also Reynolds*, 506 F.3d 103 ("In sidestepping *Monell's* rigorous

45

culpability and causation standards, the district court's holding tumbled headlong into the error warned against by the Supreme Court and imposed de facto respondeat superior liability—a result rejected by *Monell*—on the state defendants*"*) (emphasis in original; citation omitted). The District Court contravened nearly fifty years of § 1983 jurisprudence and cast the die for the remainder of the case, which then cascaded into a series of further errors, resulting in a substantive and procedural quagmire.

Notably, the District Court improperly tied Dr. Moores' official capacity liability to a claim *that was not asserted against her or any other official capacity defendant*. Plaintiffs' only claim against an official capacity defendant was their First Claim for Relief, which they conceded, and the District Court agreed, was rendered moot by the rescission of the MWAP Policy. (A39351-39352). The case against Dr. Moores thus should have ended immediately after the Court held that the First Claim for Relief was moot.

The District Court, however, circumvented *Monell* and effectively *rewrote* Plaintiffs' Second Claim for Relief to include allegations against Dr. Moores found nowhere in the SAC, holding that "Plaintiffs' second claim for relief exists independent from the MWAP Policy" based on the theory that "DOCCS medical providers continue to deny and discontinue their patients' MWAP medications without medical justification." (*Id.*). The Second Claim for Relief, however, pled

only a deliberate indifference claim against *subordinates* of Dr. Moores "in their individual capacities": "Defendants Dinello, Mueller, Hammer, Andola, Gusman, Lee, Mantaro, Braselmann, Karandy, Acrish, Ashong, Salotti, Dar," and several Jane and John Does. (A611). It did not name Dr. Moores or any other official capacity defendant and provided no basis to impose injunctive relief against her. *See generally Stewart v. U.S. I.N.S.*, 762 F.2d 193, 198 (2d Cir. 1985) (reviewing court "lacked jurisdiction" over injunction claims not asserted in underlying action).

Critically, although Plaintiffs notified the District Court more than nine weeks *after* the preliminary injunction decision that they intended to seek leave to amend the Second Claim for Relief to add Dr. Moores as a defendant in her official capacity (A39554-39562), they never actually pursued that amendment, and the District Court never granted an amendment. Thus, neither Plaintiffs nor the District Court corrected the obvious due process elephant in the room—*Dr. Moores was not sued on the sole claim remaining before the Court.*

By sua sponte making Dr. Moores an unnamed defendant to the individual capacity claims asserted only against her subordinates, the Court improperly restructured the entire case, and allowed Plaintiffs to prove only that one or more of these subordinates denied or discontinued an MWAP medication without proper medical justification, without more. The District Court, by contravening the well-established *Monell* requirements and transmogrifying the individual capacity

47

Second Claim for Relief into a *respondeat superior* claim barred by *Monell*, committed clear error. The Court's final judgment on the merits cannot be uncoupled from that error and should be reversed.

### 2.  Plaintiffs' Proof Failed to Satisfy *Monell*.

With the District Court's erroneous *respondeat superior* ruling in hand, Plaintiffs did not attempt to prove *Monell* culpability or causation at trial. They held steadfast in their position that because they were seeking injunctive relief, they had no obligation to satisfy *Monell* (A39754 "[t]his is not a claim for damages. It's a claim for injunctive relief. *Monell* claim is a claim for damages, period"]).  Thus, the only policy that Plaintiffs identified was the MWAP Policy, which DOCCS repealed on February 8, 2021, more than two years and six months before the trial.

Plaintiffs did not object to the direct medical providers' handling of prescriptions under the MWAP Policy. Rather, Plaintiffs faulted the RMDs, who were responsible for approving pain prescriptions while the MWAP policy was in place, but did not always have the proper medical records before them, leading to allegedly improper denials of effective medications. (A40011-A40012). Dr. Moores provided undisputed testimony, however, that after the MWAP Policy was rescinded, DOCCS no longer had any policies, customs or practices limiting a provider's ability to prescribe those medications, and that RMDs no longer had any

oversight with respect to a provider's ability to prescribe those medications. (A40260-40262, A40292-40293, A40295).

Dr. Moores also testified, without contradiction, that none of the 44 DOCCS facilities currently refused to prescribe any of the medications previously governed by the MWAP Policy, including tramadol (Ultram), Lyrica (pregabalin), Cymbalta (duloxetine), and Neurontin (gabapentin). (A40291-40293, A40305). Based on this evidence, Plaintiffs could not establish the continued existence of the problem that that their expert had identified under the MWAP regime—*i.e.*, that RMDs were preventing them from receiving their MWAP medications. The undisputed evidence demonstrated that was no longer the case.

With the MWAP policy eradicated and RMDs removed from the prescription writing process, Plaintiffs took a scattershot approach at trial, offering only a handful of inmates who claimed they were deprived of "effective" pain medications by their direct medical providers after MWAP was repealed. None of these individuals testified that their medical providers were unable or unwilling to prescribe them pain medications due to the former MWAP policy, or because any RMD had refused to approve their prescription. Plaintiffs also made no effort to directly link Dr. Moores or any other DOCCS policymakers to the treatment decisions made by their direct medical providers. They failed to assert, much less prove, that Dr. Moores or any other DOCCS policymaker made a conscious choice that effectively allowed or

49

ratified any decisions made by these medical providers. The record thus lacks any proof whatsoever of "tolerant awareness" of any unconstitutional conduct that could demonstrate institutional indifference or culpability at the policymaking level.

In fact, the trial evidence established the opposite. It showed that Dr. Moores ensured all medical staff were trained on Policy 1.24A. (A40340-40342), and that medical providers are now regularly peer reviewed to ensure proper administration of chronic care medicine. Dr. Moores and her colleagues review and address any standard of care issues brought to their attention by facility Superintendents or executive team members, through SURN audits, letters from patients, or from Dr. Moores' own regular records review. (A40297, A40299). In 2023, Dr. Moores learned of *just two issues* specifically concerning the administration of chronic pain medication, neither of which concerned the rescinded MWAP Policy, and both of which she promptly responded to with numerous corrective actions. (A40300-40301, A40303-40304, A40340-40342). For these reasons, Plaintiffs applauded Dr. Moores at trial for her proactive approach following the MWAP Policy's repeal (A40342 [statement of class counsel to Dr. Moores: "I do want to say you've done more for my clients than anyone else within DOCCS. So, despite this, know that we appreciate you"]). On this record, the District Court lacked any basis to find that Dr. Moores made a "conscious choice" to allow a widespread pattern and practice of unconstitutional conduct, that she had acquiesced to such conduct, or that she was

tolerantly aware of such conduct, as required to establish "a purposeful rather than negligent course of action." *See, e.g., Reynolds,*, 506 F.3d at 193; *Davis v. City of New York*, 75 Fed. Appx. at 829-830 ("we see insufficient evidence in the record upon which a reasonable jury could have found that the final decisionmaker . . . ratified any unconstitutional conduct toward Davis and the unlawful basis for such conduct").

The District Court avoided any discussion of *Monell* in its final determination on the merits and focused instead on the distinct deliberate indifference standard for *individual capacity claims.* But even in this regard, the Court only specifically identified <u>two</u> class members, Ramal Myriee and Richard Vasquez, who purportedly suffered a deprivation of their constitutional rights at the hands of their medical providers and "remain[ed] insufficiently treated." (A41206).  With no proof before it of any direct causal link between a policy, custom or practice of DOCCS and such insufficient treatment, the Court erroneously imputed its findings with respect to these medical providers to Dr. Moores, and on this basis, imposed a class-wide permanent injunction spanning across all DOCCS facilities. This was a blatantly improper application of *respondeat superior* liability.

Even if Myriee and Vasquez were treated "insufficiently" by their medical providers, *Monell* does not render an official capacity defendant liable for "bad apple[s]." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985).  While the

District Court stated in dicta that it "could" hold that other inmates (Pine, Confessore and Lindemann) suffered deliberate indifference at the hands of their medical providers (A41208), no proof was elicited to establish that DOCCS acted with the stringent degree of fault necessary to conclude that it was the moving force behind those providers' individualized medical decisions.

Without any proof of a widespread pattern or practice, particularly one that was tolerated or ratified by Dr. Moores, the District Court turned to a handful of hearsay statements recited by class members as evidence to support its class-wide injunction. Plaintiffs Tirado, Lindemann and Myriee were permitted to testify, over Dr. Moores' objection, that when they were transferred to certain facilities, they were told by staff that their preferred medications were not available. (A41207, A39756 [Lindemann testified that, in December 2021, an unidentified nurse at Fishkill, who did not have prescribing privileges, told him that a particular provider, NP Sullivan, did not prescribe Gabapentin]; A40232 [Tirado testified that, in April 2022, a nurse, who did not have prescribing privileges, told him gabapentin is not prescribed at Marcy]; A39883-39885 [Myriee testified that PA Switz, in May 2022, told him "they don't give out that medication" at Woodbourne and "that they know what's best for me"]). The District Court improperly accepted these hearsay statements into evidence. *Acosta v. Thomas*, No. 16-cv-0890, 2019 WL 5197313, at *17 (N.D.N.Y., June 21, 2019) (rejecting, as inadmissible hearsay, plaintiff's

allegation that he was told by nursing staff at Marcy Correctional Facility that his prescription for Neurontin would be discontinued based upon a directive from Albany"), *report and recommendation adopted*, 2019 WL 3811859 (N.D.N.Y. August 14, 2019).

Even if these few hearsay statements were admissible, they are insufficient to establish *Monell* liability. Three statements made across 44 DOCCS facilities and 32,000 inmates, when there is no indication as to why the statements were made, do not establish an unconstitutional practice related to MWAP medications so "widespread and persistent" as to have the force of law. *See, e.g., Legg v. Ulster County*, 979 F.3d 101, 116 (2d Cir 2020); *Hu v. City of New York*, 927 F.3d 81, 106 (2d Cir. 2019); *Jones*, 691 F.3d at 81, 82-83; *Duguie v. City of Burlington*, 161 Fed. Appx. 177, 178 (2d Cir. 2006).

The evidence also disproved the content of these hearsay statements. While three Plaintiffs claimed to hear "we don't give that out here," the facilities they identified—Marcy, Woodbourne, and Fishkill—did, in fact, prescribe the MWAP medications. Mr. Lindemann and Mr. Johnson received Neurontin at Marcy. (A39749-39750; (ECF Case No. 1:19-cv-08173 Dkt. No. 481, pp. 8-9). Mr. Daniels was prescribed Lyrica, an MWAP drug more potent than Neurontin, at Woodbourne. (A39786-39787). And Mr. Lindemann conceded, contrary to the hearsay statement he heard from a nurse, that NP Sullivan did, in fact, prescribe Neurontin to other

inmates at Fishkill Correctional Facility.  She simply chose not to prescribe it to him. (A39777-39779).

Similarly, Dr. Moores testified that every DOCCS facility "commonly" prescribes MWAP medications after the repeal of the MWAP Policy (A40293). The District Court considered, but rejected this testimony, concluding that Dr. Moores "did not testify that *all* of DOCCS' medical providers were prescribing these medications." (A41207, n.21 [emphasis added]). Yet again, the District Court conflated *Monell* liability with individual liability, incorrectly viewing the case through a *respondeat superior* lens.  If a handful of DOCCS providers decided not to prescribe an MWAP medication in their individual medical judgment, Dr. Moores is not liable in her official capacity for those individual decisions.  Plaintiffs offered no proof that these decisions were driven by a DOCCS policy, custom, or practice, or that Dr. Moores approved of or ratified them.

In sum, the District Court's holding erroneously failed to require Plaintiffs to establish *Monell*'s policy, causation, and culpability requirements, and focused instead on the actions of individual medical providers who, in the Court's view, were culpable for either discontinuing or failing to prescribe specific, preferred medications to inmates. But "[l]iability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's actions must implement rather than

frustrate the government's policy." *Roe v. City of Waterbury*, 542 F.3d at 36-37 (2d Cir. 2008).  And here, Plaintiffs' proof woefully failed to meet that burden.

## B. Plaintiffs Failed to Establish Eighth Amendment Deliberate Indifference.

Even setting aside Plaintiffs' failure to satisfy *Monell*, the permanent injunction should still be reversed because Plaintiffs failed to establish any case of Eighth Amendment liability against DOCCS' medical providers.

Plaintiffs would have needed to show that the providers demonstrated ongoing deliberate indifference to their serious medical needs. *Mattison v. Bushey-Calley*, No. 20-1120-pr, 2022 WL 2275851, at * 1 (2d Cir. June 23, 2022). This requires both an objective and subjective showing. Objectively, "the prisoner must be actually deprived of adequate medical care, and that deprivation must be sufficiently serious." *Id*. (internal quotation marks and citation omitted).  The objective prong focuses on whether the plaintiff was deprived of "reasonable care" and whether prison officials failed to take "reasonable measures" in response to the plaintiff's medical condition. *Salahuddin v. Goord*, 467 F.3d 263, 279-280 (2d Cir. 2006).

The subjective prong, in turn, focuses on whether the charged official acted "with a sufficiently culpable state of mind." *Id*. The official must have been "actually aware of a substantial risk of serious harm and [have] disregard[ed] that risk." *Mattison*, 2022 WL 2275851, at * 1 (internal quotation marks and citation omitted). The *mens rea* necessary to establish deliberate indifference is akin to "criminal

recklessness." *Hernandez v Keane*, 341 F.3d 137, 144 (2d Cir. 2003), *quoting Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). Plaintiffs failed to satisfy either the objective or the subjective prong required to establish a deliberate indifference claim.

### 1. Plaintiffs failed to show that their medication regimens deviated from reasonable medical practice.

In this case, Plaintiffs did not complain about their ability to see medical providers, or the treatment they received for the underlying conditions that caused them to suffer chronic pain. This case was only about one thing—Plaintiffs' access to their preferred pain medications.

Thus, to satisfy the objective prong, Plaintiffs needed to establish that the medication regimens they received "deviated from reasonable medical practice for the treatment of [their] condition[s]." *Reyes v. Gardner*, 93 Fed. Appx. 283, 285 (2d Cir. 2004); *see Reyes v. Wenderlich*, No. 14-CV-6338-FPG, 2018 WL 1210892, at * 8 (S.D.N.Y. March 8, 2018), *aff'd*, 779 Fed. Appx. 55 (2d Cir. 2019); *Shephard v. Fisher*, No. 08-CV-9297, 2017 WL 666213, at *10 (S.D.N.Y. Feb. 16, 2017); *Rush v. Fischer*, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013), *aff'd*, 649 Fed. Appx. 70 (2d Cir. 2016). Importantly, this objective analysis is tempered by the Supreme Court's longstanding caution that "the prison official's duty is only to provide reasonable care." *Salahuddin*, 467 F.3d at 279, *citing Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994).

56

Plaintiffs failed to meet this standard. Plaintiffs did not offer a single medical record into evidence at trial, and no other medical evidence was offered to show that Plaintiffs' prescribed pain treatments deviated from reasonable medical practice. Plaintiffs' expert was unable fill this gap in proof. Dr. Carinci did not offer any testimony that Plaintiffs' pain medication regimens, after February 8, 2021, deviated from accepted medical practice. (A40013). He was unaware of how Plaintiffs were being treated by DOCCS' providers after the MWAP Policy was repealed and Policy 1.24A was adopted, up to the time of trial:

> Q. Ok. And you weren't asked to opine on any patient's treatment after February 8, 2021, were you?
> A. I don't think so.
> ***Q. Ok. And so you can't testify today as to the care and treatment of any patients in DOCCS custody predating your report?***
> ***A. Correct.***
> ***Q. And you can't testify that, as of today, any particular patient is getting the care they need or not?***
> ***A. I don't know.***

(A40013; *see also* A40003; A814-844). Dr. Carinci examined only 17 patients in 2020 or 2021. (A4003-4004). He also admitted that, in his opinion, DOCCS' only deviation from the reasonable standard of medical care was the RMDs' role in approving prescriptions of MWAP drugs without adequate medical records before them, a role that under Policy 1.24A had long before the trial been stripped from them:

> Q. All right. And in this case, as I understand your testimony, you're not suggesting that the frontline medical

57

> providers as opposed to the RMDs have failed to meet any standard of care, are you?
>
> A. ***No.***
>
> Q. And you, as I understand it, found fault with the RMDs themselves, not with – just to say it another way, you found fault with the RMDs?
>
> A. Yes, in general.

(A40011 [emphasis added]).

Dr. Carinci also confirmed that many of the medications and treatments administered to the patients who testified were within the standard of care for treating pain conditions, including physical therapy, chiropractic therapy, TENS units, injections, Elavil, Cymbalta, Tegretol, and suboxone (A4044-A40049). And Dr. Carinci's report incorporated materials, which he recognized as reliable, that demonstrated that gabapentinoids like Neurontin and Lyrica—Plaintiffs' most frequent drugs of choice—are *not* particularly effective for treating pain associated with diabetic neuropathy, low back pain, radiculopathy, or sciatica, that evidence of misuse of gabapentinoids is "accumulating," and that law enforcement reports have corroborated growing diversion activity and street value for gabapentinoids. (A41128-41131; A40034-40044).

Because there was *no* evidence that the treatment regimens Plaintiffs were receiving at the time of trial violated acceptable medical standards, the District Court erred in concluding that "the totality of the evidence" demonstrated that "multiple

58

DOCCS medical providers" failed to "provide *reasonable* pain medications to inmates." (A41208 [emphasis added]).  There was only one type of "proof" before the District Court on this issue—the "unsupported opinion" of select patients with histories of substance abuse as to the medications they deem most "effective" to treat their chronic pain. *See, e.g., Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).  This Court has declined to hold, however, that medical care is objectively inadequate based solely on an inmate's "stated preference" for a particular medication. *Jones v. Tompkins*, 715 Fed. App'x. 101, 103 (2d Cir. 2018). The District Court's reliance on the patients' opinions alone, therefore, was reversible error because "insofar as [the inmates] disagree[d] with the [providers'] medical judgment as to the proper course of treatment, that does not support a constitutional claim for deliberate indifference." *Rodriguez v. Gusman*, No. 21-2841-pr, 2023 WL 219203, at *2 (2d Cir. Jan. 18, 2023) (citations omitted).

### 2. Plaintiffs failed to show that their medical providers acted in a manner equivalent to criminal recklessness.

Thes subjective prong of the deliberate indifference test is not satisfied merely when a plaintiff's preferred pain medication, which provides "more effective pain relief," is switched to a different pain medication. *Mattison*, 2022 WL 2275851, at *1; *see Gutierrez-Pinto v. Rappa*, No. 22-529, 2023 WL 2396732, at *1 (2d Cir. March 8, 2023); *Rodriguez*, 2023 WL 219203, at *2. Indeed, "a prisoner does not

have the right to choose his medical treatment as long as he receives adequate treatment." *Hill*, 657 F3d at 123.

When an inmate has received medical treatment but alleges that "additional diagnostic techniques or forms of treatment" should have been administered, the case presents "*a classic example of a matter for medical judgment*" that "does not represent cruel and unusual punishment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (emphasis added); *see Lacen v. Aygemong*, 2022 WL 14177191, at *1 (2d Cir. Oct. 25, 2022) (rejecting Eighth Amendment claim where inmate was "prescribed medication, underwent x-rays, was referred to physical therapy and to a neurologist, and was given extra blankets, a cane, and special shoes" to treat his back pain, but alleged that different treatment should have been provided); *Darby v. Greenman*, 14 F.4th 124, 129 (2d Cir. 2021); *Tolliver v. Sidorowicz*, 714 Fed. Appx. 73, 74 (2d Cir. 2018).

Criminal recklessness requires more than a mere denial of preferred pain medications, or medications that an inmate personally believes to be more effective. Although a deliberate indifference claim may lie if a medical provider "consciously chooses an easier and less efficacious treatment plan than otherwise available . . . failure to provide the more efficacious treatment . . . does not, without more, rise to the level of deliberate indifference." *O'Connor v. McArdle*, 217 Fed. Appx. 81, 83 (2d Cir. 2007). Indeed, "culpable recklessness [cannot be inferred] from allegations

60

of inadequate treatment alone." *Darby*, 14 F.4th at 129 n. 3. Nor can an inmate "allege any facts as to why [a course of treatment] was wrong, or how defendant knew or should have known it was wrong, *other than the fact that plaintiff told him it was wrong*". *Darby v. N.Y.C. Health and Hosps. Corp.*, No. 18-cv-2869, 2019 WL 1994490, at *5 (E.D.N.Y. May 6, 2019), *aff'd sub nom.*, 14 F.4th 124 (emphasis supplied).

Plaintiffs must instead show that the provider *chose* to prescribe less effective and easier treatment not because of their medical judgment, but for an improper reason, *i.e.*, by acting with a sufficiently culpable state of mind. (*Id.*); *cf. Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998); *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974). "[A] medical doctor is not required to prescribe stronger pain medication on demand, and the mere fact that [a doctor] declined [an inmate's] requests for drugs more powerful (and potentially more addictive) . . . is insufficient to establish a culpable state of mind or callous disregard of an excessive risk to inmate health or safety." *Thomas v. Wolf*, 832 Fed. Appx. 90, 93 (2d Cir 2020) (internal quotation marks and citation omitted).

### 3. None of the inmates identified by the District Court as having received "inadequate treatment" suffered a constitutional deprivation.

Of the twenty-five hearing and trial witnesses, the District Court based its findings of deliberate indifference on the testimony of only seven patients:

Wilkerson, Rahman, Myriee, Vasquez, Confessore, Pine, and Lindemann. None of these witnesses offered testimony sufficient to show that their medication regimens were either objectively unreasonable or administered in a manner "equivalent [to] criminal recklessness." *Hernandez*, 341 F.3d at 144. (internal quotation marks and citation omitted).

**Mali Wilkerson.** The District Court erroneously held that Mali Wilkerson, who testified only during the preliminary injunction hearing, established deliberate indifference because his MS Contin had once been discontinued for nine days. (A39057-39062). This is insufficient because Mr. Wilkerson did not testify that his pain worsened during the nine-day period. *See Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). His provider, Dr. Burke, also acted based on his medical judgment regarding the "addiction and potential side effects" of Mr. Wilkerson's "ongoing use of MS Contin," and prescribed him Tylenol and ibuprofen instead. (A38466). *See Thomas*, 832 Fed. App'x. at 93 (denial of more powerful and potentially more addictive drugs than ibuprofen did not establish a culpable state of mind); *Acosta v. Thomas*, 837 Fed. App'x. 32, 34 (no deliberate indifference where provider was concerned with "addictive properties" of drug as basis for not prescribing it).

**Rashid Rahman.** The District Court erroneously held that Mr. Rahman established deliberate indifference based on his testimony that Dr. Win failed to

prescribe him Ultram. Mr. Rahman testified that (1) Dr. Win *offered* him Ultram, (2) he refused this medication because he did not want to have it administered under Dr. Win's observation in the infirmary, and (3) he also refused a scheduled cervical epidural steroid injection, an alternative pain treatment option that a specialist recommended (A39190-39191, A39194, A34130). Mr. Rahman did not suffer a serious deprivation of medical treatment, as he was "offered [pain] treatment but refused." *Allah v. Michael*, 506 Fed. App'x. 49, 52 (2d Cir. 2012). Nor was there any evidence that Dr. Win's decision to send Mr. Rahman to the infirmary to receive Ultram amounted to criminal recklessness, as Dr. Win did so because he believed Mr. Rahman would receive a "higher level of care" there (A39162).

**Ramal Myriee**.    The District Court erroneously held that Mr. Myriee established deliberate indifference through his testimony alleging that two providers, Dr. Ruiz and PA Switz, declined to prescribe him Neurontin after the MWAP Policy was rescinded. Mr. Myriee testified that PA Switz told him "they don't give out that medication in this facility." (A39885). Even crediting that hearsay statement, at most, it established that PA Switz was operating under a mistaken belief that Neurontin could not be prescribed at Woodbourne at the time. But that is not criminal recklessness. *See, Estelle*, 429 U.S. at 105-06 ("inadvertent failure[s]" and "negligent" actions are not "unnecessary and wanton" or "repugnant to the conscience of mankind").

Mr. Myriee then testified that Dr. Ruiz did exercise her own medical judgment, because when Dr. Ruiz declined to prescribe him Neurontin, she told him, "she's been a doctor for over 40 years and that she knows what's good for [him] and that [he] don't need that," and then sent him to a vascular specialist. (A39887). Even if she was incorrect, her medical opinion alone is not actionable. *See Salahuddin*, 467 F3d at 281. Mr. Myriee later admitted that he was not left without treatment; he was prescribed Cymbalta, a valid pain treatment (A40051) that "works for diabetic neuropathy." (A39899-39901).

No evidence suggested that either PA Switz or Dr. Ruiz knew that Neurontin would have worked for Mr. Myriee but declined to prescribe it with knowledge he would suffer without it. Mr. Myriee was treated with a multitude of medications since his incarceration in March 2022—including Neurontin, Percocet, Flexeril, aspirin, tramadol and Cymbalta. Even with these medications, Mr. Myriee still claimed his pain was "unbearable" (A38985, A38988, A39006-39007). Mr. Myriee was also prescribed Lyrica, the more "potent" form of Neurontin, which also proved ineffective. (A39880). Dr. Ruiz and PA Switz could not have been deliberately indifferent by declining to prescribe a medication that Mr. Myriee acknowledged did not help him.

***Richard Vasquez.*** The District Court erroneously held that inmate Vasquez established deliberate indifference because: (1) he was prescribed Neurontin and

Percocet in a hospital in the immediate aftermath of sustaining burns, but these medications were discontinued 3-4 days after he returned to his facility by NP Ferguson in March 2022, and (2) shortly thereafter, another nonparty provider, NP Schrader, prescribed him baclofen to treat his pain, even though Mr. Vasquez allegedly told her that it was ineffective. (A41202).

The District Court erred in relying on Mr. Vasquez's testimony that NP Ferguson told him that Mid-State was "not allowed to give out" Neurontin when he returned from the hospital. (A39821). Mr. Vasquez's testimony conflicted with his prior sworn declaration accusing NP Ferguson of falsifying his medical records by writing that he "refused to come to the window" to obtain his Neurontin as a basis to discontinue it (A30448, ¶ 16).[10] He also admitted NP Ferguson *was trying to help him* by prescribing him a self-carry medication. (A39848). The District Court thus had no basis to hold that NP Ferguson acted with a subjectively culpable mental state, when Mr. Vasquez conceded that NP Ferguson was attempting to assist him.

Nor did any basis exist to conclude that NP Schrader acted with criminal recklessness when she prescribed Mr. Vasquez a combination of Baclofen, Tegretol, Tylenol, and ibuprofen to treat his pain, instead of Neurontin. (A39832-39836; A39838-39845). Mr. Vasquez admitted that NP Schrader was searching for a

---

[10] Mr. Vasquez's medical records do not contain any such notation. They instead indicate that he at one point requested to discontinue Neurontin, opting instead for a self-carry medication (A37080; A37114).

medication that might "*help*" him when she chose Baclofen (A39839-39840), which was previously recommended by a pain management specialist and cited as a potentially useful medication in Dr. Carinci's summary of Mr. Vasquez's case. (A23914). This was insufficient to establish deliberate indifference, as "culpable recklessness cannot be inferred" where an inmate merely tells a medical provider that a medical treatment is ineffective. *Darby*, 14 F.4th at 129 n.3.

***Inmates Confessore, Pine, and Lindemann***. The District Court's deliberate indifference analysis of Confessore, Pine, and Lindemann was confined to a footnote where the Court speculated that each inmate's testimony "could be instances of deliberate indifference" that the Court "decline[d] to spill further ink on" (A41208, n. 23).

With respect to Mr. Confessore, the District Court ignored that his provider, Dr. Connelly, proactively provided a plethora of treatment to address Mr. Confessore's hand tremors and back pain, including prescribing him ibuprofen, meloxicam, primidone, and sublocade (the injectable form of suboxone), sent him to see a hand specialist, and ordered at least two MRIs. Dr. Connelly then prescribed Mr. Confessore Neurontin in response to his continued complaints of pain. (A40213-40214, A40215-40216).

Similarly, the District Court speculated that there "could be" deliberate indifference in Mr. Pine's case, given that Dr. Silver declined to prescribe him his

66

preferred Neurontin upon his transfer to Great Meadow Correctional Facility (A39729). The District Court stated, in dicta, that this discontinuance violated Policy 1.24A, but nothing in that policy requires a new provider to automatically re-prescribe medications previously prescribed at a different facility. (*See* A31316). Neither does the Eighth Amendment. *See Acosta*, 837 Fed. App'x. at 35. Plaintiffs also offered no evidence of Dr. Silver's mental state.

Finally, Mr. Lindemann's complaints regarding his most recent provider, NP Sullivan, amounted to only to a disagreement with her choice of treatment, which consisted of meloxicam, acetaminophen, an analgesic balm, a TENS unit, Cymbalta, suboxone, and a successful shoulder surgery. (A39768, A39771, A39775-39777). Mr. Lindemann deemed these treatments less effective than Neurontin, but that does not amount to a constitutional violation in the absence of any proof that NP Sullivan chose this treatment plan for an improper reason. *See Estelle*, 429 U.S. at 106; *O'Connor*, 217 Fed. Appx. at 83.

## C. **Plaintiffs' Proof Failed To Establish Standing or Irreparable Injury.**

Standing to sue for injunctive relief must be demonstrated "at all stages of litigation." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022). Allegations of past injury do not meet the constitutional minimum of standing to seek injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). To obtain injunctive relief on their §1983 claim, Plaintiffs must show (1) they "will be

injured in the future," and (2) the "existence of an official policy or its equivalent" will cause such future harm. *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004). The threatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient." *Calcano*, 36 F.4th at 74 (quotation marks and citation omitted; emphasis in original).

Similarly, plaintiffs must establish that some cognizable danger of a recurrent violation exists to meet the irreparable harm element. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Proof of past injury will not support an injunction, as "that damage is compensable through monetary award." *Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985).

Here, the District Court erred by concluding that it was enough for Plaintiffs to argue that they "remain without effective medication" to establish standing (A41197). But that is not sufficient, as standing for injunctive relief in a § 1983 case requires proof of "the existence of an official policy or its equivalent" that will cause imminent, future harm. *Shain*, 356 F.3d at 216. No such proof was ever introduced in the hearing or trial record. Plaintiffs thus lacked standing to seek injunctive relief.

The District Court further erred when it accepted Plaintiffs' argument that they demonstrated irreparable injury by establishing Eighth Amendment violations. (A41197). As shown above, Plaintiffs did not prove a single Eighth Amendment violation, and were largely only able to articulate past grievances as to their

medication regimens.  Plaintiffs have been, and continue to be, treated with constitutionally adequate care, which is inapposite to a showing of irreparable harm, or threat of any future harm.  Each patient has been provided with: (i)  either their drug of choice (in nearly every case, gabapentin), or a reasonable alternative medications to their drug of choice; (ii) numerous referrals to specialists, physical therapists, steroid injections, surgeries, MRIs, EMGs, and (iii) devices such as TENS units, canes, neck and back braces, all of which have provided patients with relief, in some form.  At most, the hearing and trial evidence consisted of allegations arising solely from past incidents, or from incidents in which Plaintiffs took exception to actions undertaken by individual medical providers that were untraceable to the MWAP Policy or any other DOCCS' policy, custom, or practice. Plaintiffs *do* have an adequate remedy at law to address those allegations, and they are actively pursuing that remedy in separate actions across the state. *See Buckingham*, 762 F.2d at 262.

## D. The Equities Did Not Favor the Overbroad, Intrusive Relief Granted By The District Court.

The District Court erred when it held that the balance of equities tips in favor of an injunction, as it exceeded the strict restraints placed on federal courts in these circumstances. *See, e.g. Dean v. Coughlin* 804 F.2d 207, 213-214 (2d Cir. 1986). "'The factors . . . [that] are pertinent in assessing the propriety of injunctive relief'

are 'the balance of equities and consideration of the public interest.'" *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012), *quoting Winter*, 555 U.S. at 32.

Plaintiffs' witnesses admitted that they are receiving various forms of treatment for their pain, and half of Plaintiffs' trial witnesses admitted that they are currently receiving their preferred medications, and thus do not stand to benefit from a mandatory injunction. *See Berni v Barilla S.p.A.*, 964 F.3d 141, 147 (2d Cir. 2020) (where injunctive relief would not benefit "all members of the class," it should not be granted). Not a single class member testified how the absence of an injunction may result in irreparable harm in the future as it relates to their care for chronic pain—the very testimony the district court *would* have needed to hear to properly evaluate to whom the equities favor.

To the contrary, the trial evidence established the significant prejudice to Dr. Moores. By the time of trial, the preliminary injunction had already created a strain on DOCCS' resources in such a way that harms, not helps, the patients. (A40310-40316). Dr. Moores' staff had already spent approximately 800 hours scouring the medical problems lists for individual patients to determine whether they *might* have a condition that causes chronic pain so they can be coded 338, and then scheduled for an individualized assessment. As of the date of Dr. Moores' trial testimony, 60% of the entire population still needed to be reviewed for potential 338 coding, which

equates to approximately 20,000 patients and *thousands of hours* of anticipated medical problems list review.

Moreover, although the annual pain assessment was already incorporated into the text of Policy 1.24A, its formalization and the judicial oversight created by the District's Court's preliminary injunction, caused providers *and patients* to question why the additional, lengthy appointment was being formalized and heavily enforced (*See* A40314-40315) and to caution that it is "not going to produce any positive result." (A40316). Indeed, some providers had already completed the requisite work and communication with their patients, making the completion of a new pain assessment form redundant and unnecessary (*Id.*). For the remaining providers, the pain assessment process may not "change[] anything with their evaluation and treatment for their chronic pain." (A40316-40317). In other words, the outcome of a patient's treatment plan – with or without the formalized pain assessment Ordered by the Court – is the same. Moreover, Dr. Moores testified that formalizing the pain assessment process could result in the delay of care for a patient with diabetes or hypertension, for example, because DOCCS is already short staffed. (A40317).

Finally, as to the adequacy of other remedies at law, Plaintiffs' injunctive class members are currently pursuing individual damages actions for monetary relief, based on the same past injuries raised at trial. James Pine, Mark Daniels, Richard Vasquez, and Kenneth Windley each currently have individual lawsuits for damages

71

stemming from the same allegations,[11] as do the dozens of other class members who filed individual lawsuits following the denial of the certification of the liability class.[12] Accordingly, the denial of a mandatory-class wide injunction would not prejudice Plaintiffs.

For all these reasons, the equities tip decidedly in Dr. Moores' favor and against issuing a state-wide mandatory injunction.

**E. Plaintiffs' Injunction Claim Is Moot and Barred By the Eleventh Amendment.**

A court's jurisdiction is "constitutionally limited to actual, ongoing cases or controversies." *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 392 (2d Cir. 2022) (internal quotation marks and citations omitted). "A moot action therefore must be dismissed, even if the case was live at the outset but later events rendered it moot." (*Id.*) (internal quotation marks and citations omitted). For a case seeking injunctive relief against an official capacity defendant to "remain live, there must be a possible effectual remedy *for the violations it alleges*, and the remedy must be prospective relief that would address an ongoing violation of federal law." (*Id.*) (emphasis supplied); *see Clark v. DiNapoli*, 510 Fed. Appx. 49, 51 (2d Cir. 2013). The doctrine, however, cannot be used "to adjudicate the legality of past conduct." (*Id.*) Instead, it

---

[11] *See James Pine v. Hammer et al.*, 23-cv-7148, S.D.N.Y. J. Preska; *Mark Daniels v. Mueller, et al.*, 23-cv-0564, J. Preska; *Richard Vasquez v. Burke, et al.*, 23-cv-1004, N.D.N.Y., J. Sannes; *Kenneth Windley v. Hammer, et al.*, 23-cv-7151, J. Preska.
[12] *See* list of "Related Cases" filed under the District Court's docket (19-cv-8173).

is limited to addressing ongoing violations of law alleged "*in [the] operative complaint*." *Exxon Mobil Corp.*, 28 F.4th at 392 (emphasis added).

Plaintiffs commenced this action against an official capacity defendant to enjoin alleged constitutional violations caused by the MWAP Policy, which no longer exists. Indeed, the operative complaint, which bound the District Court's consideration on the merits, sought to adjudicate deliberate indifference arising from the MWAP Policy based upon *past* events occurring exclusively between the years of 2017 and 2019, prior to the policy's rescission in February 2021 (A650, A654-655, A673, A610-612). Specifically, Plaintiffs alleged that this policy was unconstitutional because RMDs were "categorically refus[ing] to approve the medications" requested by treating physicians at the time. (A631).

These allegations of past violations were insufficient to show that a live case or controversy still existed at the time of the hearing and trial. RMDs no longer play any role in the prescription of pain medication to DOCCS' patients following the rescission of the MWAP Policy. Because Plaintiffs could no longer base their injunction claim on the role of the RMDs, Plaintiffs litigated an entirely new case by the time they got to trial, based on scattershot unpled allegations of individual deliberate indifference that were wholly untraceable to the policy that was the impetus of this lawsuit. The trial court could not "enjoin what no longer exists," but still purported to do so. *Exxon Mobil Corp.*, 28 F.4th at 393. Accordingly, Plaintiffs'

injunction claim should have been dismissed below as moot and barred by the Eleventh Amendment.

## II.     THE PERMANENT INJUNCTION ORDER VIOLATES THE PLRA.

The Prison Litigation Reform Act of 1995 ("PLRA") was intended, in large part, to limit the prospective relief to prisoners so that is narrowly tailored to the federal rights violation at issue, by way of the least intrusive means necessary to correct that violation—often referred to as the needs-narrowness-intrusiveness test. 18 U.S.C. § 3626(a)(1)(A).   The PLRA requires courts to strike a "constitutionally permissible balance" between a prisoner's constitutional rights and prison officials' administrative discretion and safety concerns when granting equitable relief. *Wilkinson v. Austin*, 545 U.S. 209, 229-230 (2005).

 The Southern District has relied on sister Circuits to demonstrate that "it is not sufficient to simply state in conclusory fashion that the requirements of the remedial order satisfy the [PLRA]; rather, district courts must make 'particularized findings, on a provision-by-provision basis, that each requirement imposed by the [Order] satisfies the needs-narrowness-intrusiveness criteria.'" *Benjamin v. Fraser*, 156 F. Supp. 2d 333, 341 (S.D.N.Y.  2001), aff'd but criticized on other grounds, 343 F.3d 35 (2d Cir. 2003) (citing *Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000); *Ruiz v. United States*, 243 F.3d 941, 950-51 (5th Cir. 2001); *Castillo v. Cameron County*, 238 F.3d 339, 354 (5th Cir. 2001).

Here, the permanent injunction order hardly particularizes the narrowness, necessity, and non-intrusiveness requirements of the PLRA.  It offers only one broad paragraph addressing these requirements, without a provision-by-provision analysis, in relevant part:

> To remedy the violations of Plaintiff Class members' rights, the Court orders the following relief, which is directly aligned with the implementation and enforcement of DOCCS' own Policy 1.24A.  The Court finds this relief is narrowly drawn, extends no further than necessary to correct the violation of the constitutional rights at issue, and is the least intrusive means necessary to correct the violations of the Plaintiff Class members' federal rights. (A41234-41235).

Under similar circumstances, where the "district court's one-sentence, boilerplate paragraph [] regarding PLRA compliance," consisted of "a rote, catch-all assertion," the Eleventh Circuit held that an injunction was "seriously deficient" and should be vacated.  *Hoffer v. Secretary, Florida Dept. of Corrections*, 973 F.3d 1263, 1278-79 (11th Cir. 2020) (citing *Cason*, 231 F.3d 785).  So too here. The District Court failed to conduct the appropriate needs-narrowness-intrusiveness analysis for *each* term of the Order.

The Permanent Injunction can be summarized into five components: it orders DOCCS to (i) follow its own Policy 1.24A (*see* A41236, ¶ 1); (ii) provide training to current providers on Policy 1.24A, as well as to forthcoming new providers hired by DOCCS (*see* A41238, ¶ 2, 3); (iii) add Code 338 to every incarcerated individual, current and incoming, who suffers from chronic pain (*see* A41238-41239, ¶ 4, 5);

(iv) ensure that each patient who is coded 338 receives an annual "individualized assessment" (*see* A41239-41240, ¶ 6, 7); and (v) "identify and prioritize" class members whose MWAP medications were previously discontinued for any coding "and/or" individualized assessment. (*See* A41241, ¶ 8). Each and every term fails the PLRA's needs-narrowness-intrusiveness test based on the record before the Court.

The first component, which orders DOCCS to follow its own Policy 1.24A, is intrusive because it inserts judicial oversight of a DOCCS Health Services Policy, cast with threats of contempt if not executed perfectly. *See, e.g., Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012) (emphasizing that prison administrators have substantial discretion over the institutions they manage). It has taken a Policy already in place, and inserted judicial surveillance over how it is executed, which is inapposite to the PLRA's broad goals of limiting the "micromanag [ing] [of] State and local prison systems." 141 Cong. Rec. S14611-01, 1995 WL 573055, at *S14626 (Sept. 29, 1995) (statement of Sen. Dole).

Notably, a violation of a DOCCS policy does not state a claim for a constitutional violation under 42 U.S.C. § 1983. *See Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002); *see also McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *11 (N.D.N.Y. Oct. 29, 2014); *Thompson v. New York State Corr. & Cmty. Supervision*, No. 22-CV-6307-FPG, 2022 WL 4562318,

at *8 (W.D.N.Y. Sept. 29, 2022).   It was simply not the District Court's role to administer DOCCS' medical policy in each of the 44 facilities across New York, especially where, as here, the currently operative medical policy is not even alleged to be causing any constitutional harm, and especially where the trial record has established only a few remote incidents of patients' preferred medication be denied in lieu of reasonable alternatives.

The second component regarding employee training on Policy 1.24A is neither necessary nor narrow in scope.  The allegations in the second cause of action are that the named providers denied or discontinued effective medications because of the MWAP Policy. Although Plaintiffs argued that staff were not trained to conduct the 2020 reassessments, failure to train was neither alleged, nor tried in either trial. Thus, since Plaintiffs offered no proof that any lack of training *caused* class members not to receive their choice in treatment, the terms detailed in paragraphs 2 and 3 of the order are wholly unnecessary and are far too broad to cure any of the alleged constitutional defects.

Components three, four and five work in tandem, as the purpose of coding patients with "338" is, in part, to ensure that those patients are scheduled and receive an annual pain assessment. These provisions are neither narrow nor necessary and are exceedingly intrusive.  Implementing *individualized assessments* as a term of a class-wide permanent injunction is wholly at odds with the intent of a F.R.C.P.

23(b)(2) class.  In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), the Supreme Court interpreted F.R.C.P. 23(b)(2) and held that an injunctive class is intended to challenge systemic policies or practices of the defendant with substantially uniform application.  Since a (b)(2) class requires cohesiveness with respect to their alleged injuries, any "individualized examination" of each member necessarily eliminates that required cohesion, making a (b)(2) certification inappropriate.  Class-wide injunctive relief under (b)(2), therefore, must be uniformly applicable to the class, and not one where the relief sought requires individualized inquiry into factual circumstances of each class member or that may result different types of redress tailored to individual injuries.  *See Wal-Mart*, 564 U.S. at 360-62.  Here, the Order requires "individualized reassessments" in contravention of what the (b)(2) class was intended to accomplish.

Next, the directive that DOCCS affirmatively identify patients who *may* suffer from chronic pain—effectively requiring DOCCS to affirmatively search for *potential* class members—and then provide a largely duplicative individualized assessment, is not a narrowly drawn requirement.  An injunction cannot "mistakenly conflate what is constitutionally *adequate* . . . with what is constitutionally *required*." *Westefer v. Neal*, 682 F.3d 679, 683-84 (7th Cir. 2012) (emphasis in original) (vacating an injunction because it imposed "highly specific formal

78

requirements" which turned the details of the Order into constitutional requirements).

In sum, no common thread exists running throughout this testimony heard during the evidentiary hearing to warrant the terms entered by the Court. All Plaintiffs were able to show was a few remote incidents across where pain medications were discontinued for a short period of time, and those patients' medical issues are now being properly cared for as a result of Dr. Moores' implementation of Policy 1.24A. The Permanent Injunction Order thus violates the Prison Litigation Reform Act.

## III. THE DISTRICT COURT ERRED IN GRANTING PLAINTIFFS' MOTION TO CERTIFY CLASS PURSUANT TO F.R.C.P. 23(B)(2)

Dr. Moores seeks de novo review of the District Court's granting of Plaintiff's Motion to Certify Class pursuant to F.R.C.P. 23(b)(2). Plaintiffs were required to "affirmatively demonstrate" compliance with Rule 23, and prove, by a preponderance of the evidence, that each requirement under F.R.C.P. 23 was met. *Wal-Mart*, 564 U.S. at 350; *Johnson v. Nextel Commc'ns. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). Plaintiffs were required to satisfy both the general requirements for class certification under Rule 23(a), as well as the specific requirements set forth in at least one of the subsections of Rule 23(b). *Wal-Mart*, 564 U.S. at 345. Plaintiffs failed to do so.

A. **The District Court erred in holding that Plaintiffs satisfied the requirements of Rule 23(a).**

Under Rule 23(a), members of a class may sue as representative parties on behalf of all members only if Plaintiffs can establish four prerequisites: (1) the class is so numerous that joinder of all its members is impractical ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). This Circuit also recognizes a fifth requirement of "ascertainability" for class certification. *In re Petrobras Securities*, 862 F.3d 250, 257 (2d Cir. 2017). The District Court erred in holding that Plaintiffs satisfied each of the Rule 23(a) requirements.

*First*, as to numerosity, the District Court did nothing to meaningfully assess Plaintiffs' allegation that "the proposed classes in this case include hundreds, if not thousands, of incarcerated individuals who lost effective medical treatment and those who require constitutionally required individualized assessments and effective treatment moving forward." (Case No. 1:19-cv-08173 Dkt. No. 371, p. 9). The Court simply accepted Plaintiffs assertions as to the size, scope, and content of the class, despite that their key indicator for class membership was the loss of "effective" pain treatment during the MWAP regime, which can only be determined on an individualized, case-by-case basis. "In that regard common sense would dictate that

patients are not fungible and that the medical necessity of pain alleviation is not universal.  The conclusion must be, therefore, that any assertion that the 'class represented by plaintiffs is so numerous that joinder of all is impracticable' is sheer sophistry." *Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66, 71 (E.D.N.Y. 2000).

Further, although three years had passed between the commencement of this action and Plaintiffs' motion for class certification, Plaintiffs offered no evidence that would have allowed the Court to capture the potential members of an injunctive class in need of prospective medical relief. Plaintiffs offered information that was tailored to capturing potential members of a liability class, as it focused only on past events during the MWAP regime, but they did not show that the same individuals they identified as having lost their "effective medications" as a result of the MWAP Policy were still being denied those "effective medications" for reasons related to the MWAP Policy three years later.   Conversely, Dr. Moores reviewed the medical records of each patient that Plaintiffs identified in their preliminary injunction motion as potentially still being impacted by MWAP and determined that none of those patients had pain medications denied for non-medical reasons or discontinued due to any policy.   (A31304-A31306, ¶¶ 86-94).

The testimony presented at the preliminary injunction hearing only confirmed that each of the representative class members was under active treatment for pain,

negating any showing of ongoing constitutional violation in need of class-wide prospective injunctive relief. The evidence demonstrated that Policy 1.24A requires an individualized assessment of each patient and that Dr. Moores has implemented various auditing tools to monitor compliance, leaving no individuals to make a class in need of injunctive relief.  As such, the District Court erred in finding that Plaintiffs had satisfied the numerosity requirement.

*Second,* as to commonality, the District Court again offered only a brief recitation of the parties' positions and, in a broad conclusory fashion, held that it would rely on the "string of cases" cited by Plaintiffs and thus found that Plaintiffs met their showing of commonality. (A39383). Those cases either did not involve medical treatment of class members, or if they did, were inapposite. *See, e.g.*, *McGee v. Pallito*, No. 1:04-CV-00335-JGM, 2015 WL 5177770, at *4 (D. Vt. Sept. 4, 2015); *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013); *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 575 (N.D.N.Y. 2017). The only case relied upon by Plaintiffs and the District Court that did involve medical treatment was *Barfield v. Cook*, No. 3:18-CV-1198 (MPS), 2019 WL 3562021 (D. Conn. Aug. 6, 2019).  *Barfield* is distinguishable because the proposed prisoner class members all suffered from <u>the same</u> underlying condition: chronic Hepatitis C Virus ("HCV"). (*Id.* at 1).  In this case, the proposed class shared a similar *symptom* – chronic pain – which the evidence sufficiently demonstrated can be caused from an array of

82

maladies including diabetic neuropathy, spinal stenosis, sciatic nerve damage, chronic back pain, among many others, each of which require a different course of treatment.  Moreover, in *Barfield*, the commonality requirement was met because the prisoner class sought <u>identical</u> injunctive relief: oral medications called direct-acting antiviral drugs (DAAs), which specifically treat HCV.  (*Id.* at 10).  In short, the entire *Barfield* class involved a single medical condition, and a single form of treatment, circumstances unequivocally distinct from those in this case.

The District Court contravened the established caselaw on commonality, which requires that Plaintiffs "demonstrate that the class members 'have suffered *the same injury*.'" *Wal-Mart*, 564 U.S. at 349-50 (quoting *General Telephone Company of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). The proposed class members' claims "must depend on a common contention . . . that it is capable of class wide resolution," meaning "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Here, Plaintiffs broad interpretation that the denial or loss of any MWAP medication equates to the "same injury" is incorrect.   Each class member has a unique medical background, diagnosis, and treatment plan requiring a "highly individualistic determination" that mitigates against a finding of commonality. *Pecere*, 194 F.R.D at 71 (quoting *Klein v. Empire Blue Cross and Blue Shield*, No.

93 CIV. 5187 (JSM), 1998 WL 336633, at *4 (S.D.N.Y. June 23, 1998)).  For these reasons, the commonality requirement has not been met.

*Third*, the District Court erred in holding that Plaintiffs satisfied the typicality requirement. The typicality requirement is satisfied when "each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (citation omitted); *see also Rapcinsky v. Skinnygirl Cocktails, LLC*, No. 11 CIV. 6546 (JPO), 2013 WL 93636, at *4 (S.D.N.Y. Jan. 9, 2013). Because "the typicality requirement concerns the fairness of allowing an entire class's claim to rise or fall with the fate of the named representative's claims," class certification is not appropriate where defendants can raise arguments regarding specific causation issues "that will focus the litigation on the particularities and factual circumstances" of a particular named plaintiff or proposed class representative. *Rapcinsky*, 2013 WL 93636, at *5, 9. "It is often said of typicality in class actions that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Id.* at *6 (citations omitted). Thus, "where the lead plaintiff's claims fail, so too will those of the class." *Id.*

Here, the District Court held that typicality existed because at least some of the named Plaintiffs "still require appropriate assessments and treatment and thus have claims typical of the injunctive class." (A39383-39384). During the February 2023 hearing testimony on which the Court based this holding, each of the named

Plaintiffs testified about different medications, prescribed for different conditions, under distinctly different factual scenarios. The only "typical" component of their testimony was that the MWAP Policy played *no role* in any of the specific allegations raised by the hearing witnesses:

*(1)* Aaron Dockery's medication was temporarily discontinued by a nurse practitioner who, in the exercise of her independent medical judgment, had "safety and medical" concerns because Mr. Dockery refused a mouth check which triggered a substantial risk of diverting medications (*see* A38907-A38931);

*(2)* Rashid Rahman was offered the medication he wanted (Ultram) by his PCP, but refused it, and also refused other pain treatment alternatives recommended by a specialist and facilitated by his PCP (*see* A39180-39198);

*(3)* Felipe Rivera Cruz's medication (Lyrica) was discontinued in 2015, before the MWAP Policy existed, and he admitted that his current PCP did not deny him Lyrica and never discontinued any prescription for Lyrica (*see* A39107-39131); and

*(4)* Mark Daniels did not claim that any specific provider refused him necessary pain treatment after MWAP was rescinded; his Neurontin was discontinued during MWAP because he repeatedly refused it as

ineffective, and he has since been treated with steroid injections pursuant to specialist recommendations. (*See* A39198-39206).

Similarly, none the patients Plaintiffs identified as representatives for the injunctive class—Peter Allen, Mark Daniels, Robert Oleman, Rashid Rahman, Felipe Rivera-Cruz, and Wayne Stewart— were denied any pain medications because of a DOCCS policy or for non-medical reasons after Dr. Moores became Chief Medical Officer. (*See* A39389; A31304-31308, ¶¶ 86-96; A31337-31542; A31760-31861; A35296-35435; A34074-34166; A34167-34656).

In sum, Plaintiffs failed to offer any evidence of a typical scenario where any DOCCS provider was still following the rescinded MWAP Policy. Nor did they identify, with supporting evidence, any inmate who had recently, or would imminently, be denied a pain medication due to the MWAP Policy. Not one witness testified before the District Court that a PCP was unable to prescribe them pain medication that the provider determined, in their medical judgment, was appropriate.

*Fourth,* the Court erred in holding, without specifying its rationale, that Plaintiffs satisfied the adequacy requirement because "plaintiffs' interests are not 'antagonistic' to the interest of other class members and Plaintiffs' attorneys are 'qualified, experienced, and able to conduct the litigation." (A39384 [citing *Baffa v. Donaldson, Lufkin, & Jenrette Sec. Corp.*, 222 F. 3d 52, 60 (2d Cir. 2000]). To satisfy the Rule 23(a) adequacy requirement, a class representative must "possess

86

the same interest and suffer the same injury as the class members." *Spann v. AOL Time Warner, Inc.,* 219 F.R.D. 307, 320 (S.D.N.Y. 2003) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)).

While the class certification motion was pending, four representative class members testified at the February trial:  Mark Daniels, Felipe Rivera Cruz, Rashid Rahman and Aaron Dockery.  They each, however, lacked credibility sufficient to represents the interests of the class.  "Courts [] have denied class certification based on the inadequate qualifications of plaintiffs . . . [that] are so lacking in credibility that they are likely to harm their case." *See In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y. 1997) (citing *Panzirer v. Wolf*, 663 F.2d 365 (2d Cir.), *vacated on other grounds,* 458 U.S. 1105 (1982)). Before the February hearing, Mr. Daniels alleged that he "remains untreated" with Neurontin (ECF Case No. 1:19-cv-08173 Dkt. No. 378, pp. 23-24). During the hearing, however, Mr. Daniels testified that Neurontin "gave [him] stomach problems" and does not help him. (A39201). Notably, Mr. Daniels' Neurontin was discontinued when the MWAP Policy was in place not because the prescription was denied by an RMD, but rather because Mr. Daniels repeatedly refused the medication as ineffective. (A3875-3879, A3880-3885).

Mr. Dockery initially alleged that injunctions were necessary because following his 2020 reassessment, his Neurontin was not reinstated. (ECF Case No.

1:19-cv-08173 Dkt. No. 378, p. 13). During the February hearing, however, Mr. Dockery admitted that he had been effectively treated with Neurontin since MWAP was rescinded and was only taken off for a brief period in December 2022 when he refused the routine mouth check to confirm. (A38989, A38910, A38917-38919; A38924-38926).

Mr. Rahman alleged that following the 2020 reassessments, he remained untreated with Ultram. At the hearing, Mr. Rahman testified that Dr. Win *agreed* to provide Ultram, but recommended that Mr. Rahman "go upstairs" to the infirmary, where Dr. Win could administer it under observation, but Mr. Rahman refused. (A39190-39191, A39193-39194, A34129). Finally, Mr. Rivera Cruz claimed in his reply declaration, allegedly signed two months before the February hearing, that Dr. Win, his current PCP, "does not listen to me when I tell him that Lyrica has always been effective for me." (A30444, ¶ 24). Mr. Rivera-Cruz admitted, however, that his prior declaration was false; that he has *not* communicated to Dr. Win that he believes Lyrica is effective for him. (A39122). In fact, Mr. Rivera-Cruz testified that Dr. Win has *never* denied him Lyrica and has *never* discontinued his Lyrica, and he has never mentioned Lyrica to Dr. Win. (A39125). For these reasons, representative class members could not adequately represent the class.

*Fifth*, the Court erred in concluding that Plaintiffs satisfied the ascertainability requirement. To be ascertainable, plaintiffs must demonstrate that the sought after

class "is readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling." *McBean v. City of New York*, 260 F.R.D. 120, 132–33 (S.D.N.Y. 2009) *(citing Dunnigan v. Metropolitan Life Ins. Co.,* 214 F.R.D. 125, 135 (S.D.N.Y.2003); *People United for Children, Inc. v. City of New York,* 214 F.R.D. 252, 256 (S.D.N.Y.2003)).  The ascertainability requirement requires that a class be "sufficiently definite *so that* it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Securities*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (emphasis in original; cleaned up).  The class must be "defined by objective criteria *so that* it will not be necessary to hold mini-hearing on the merits of each case." *Petrobras*, 862 F.3d at 266-67 (citing *Brecher*, 806 F.3d at 24) (emphasis in original; cleaned up).  "In other words, a class should not be maintained without a clear sense of who is suing about what." *Petrobras*, 862 F.3d at 269.

Here, Plaintiffs' proposed class included all incarcerated individuals suffering "from chronic pain or neuropathies" that require "individualized assessments of medical need for treatment with MWAP medications," as evidenced by their medical records.  (ECF Case No. 1:19-cv-08173 Dkt. No. 371, p. 14).  Ascertaining the membership of such a class necessarily requires: (1) a subjective, individualized medical determination for every single incarcerated individual believed to be

suffering from chronic pain or neuropathies; (2) which can only be made by a medical professional; (3) confirming that he or she "requires," in the medical professional's individual judgment, an assessment for treatment with an MWAP medication.

Nevertheless, the District Court concluded, without explaining its rationale, that the proposed injunctive class had been defined using "objective criteria" (A39385-39386), relying on Plaintiffs' attorney work product spreadsheet that claimed to classify DOCCS' pain patients based on MWAP forms that were only used while the MWAP Policy was in effect. Plaintiffs' spreadsheet, even if accurate[13], is irrelevant to the injunctive class that was certified to address ongoing treatment *after* the MWAP Policy was rescinded. Plaintiffs' data only claims to show a pre-2021 snapshot in time under the MWAP Policy. It does not indicate whether patients received individualized assessments after the MWAP Policy was rescinded and are currently receiving effective treatment. Dr. Carinci's report suffers from the same fatal flaw because the report does not opine on medical records post-dating 2020. Thus, Plaintiffs' only "proof" on ascertainability failed to show which DOCCS patients "suffer or will suffer" from chronic pain as a result of any present pain treatment policy enforced by DOCCS.

---

[13] Mr. Avellino's declaration expressly states that in an effort to purportedly "streamline" the data, certain key points were altered when inputted into the Project Bob database, such as the names of the medications being requested as well as the results of the MWAP approvals. (A27303-27305).

Each of the examples Plaintiffs identified in support of their claims involves a different set of circumstances, a different drug, a different provider, a different story; there is no common theme or path to proving an ongoing constitutional violation that would warrant injunctive relief. Given the individualized nature of the Plaintiffs claims, they are forced to propose a class based on subjective, individualized, and largely undefined criteria, *i.e.*, those incarcerated individuals "who suffer or will suffer from chronic pain/and or neuropathies who require *individualized assessments* of medical need for treatment with MWAP medications." (ECF Case No. 1:19-cv-08173 Dkt. No. 371, p.7). This injunctive class violates the ascertainability requirement because it is not "defined by objective criteria that establish a membership within definite boundaries." *Petrobras*, 862 F.3d at 257, 264, 269. Plaintiffs provide no objective or even plausible way of determining whether an individual is already receiving effective treatment, or whether they "require" an assessment for treatment with an MWAP medication.

Plaintiffs have not satisfied any of the Rule 23(a) requirements, much less all of them.

**B. The District Court erred in finding that Plaintiffs satisfied the requirements of Rule 23(b)(2).**

Even if Plaintiffs could meet their burden under Rule 23(a), they must also satisfy the requirements for certification under one of the subdivisions of Rule 23(b). Certification for injunctive relief under Rule 23(b)(2), provides for certification in a

"single circumstance," *i.e.,* when "the party opposing the class has acted or refused to act on grounds that apply generally to the class," thereby making appropriate "final injunctive relief or corresponding declaratory relief . . . [with respect to] the class as a whole." *Berni v. Barilla S.p.A*, 964 F3d 141, 146 (2d Cir. 2020). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (citation omitted). Thus, certification is appropriate under Rule 23(b)(2) only "when a single injunction or declaratory judgment would provide relief to each member of the class." (*Id*). Each member of the class must stand to incur a benefit from the relief sought; "it cannot be the case that some members receive no benefit while others receive some." *Berni*, 964 F3d at 147, n.28.

Moreover, "[u]nder Second Circuit law, there is no need for (b)(2) certification when a defendant is willing to 'represent[ ]' that it 'ha[s] no intention of reinstating' a challenged policy, even if the policy has only been challenged on an individual basis." *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 412 (S.D.N.Y. 2015); *see also Berger v. Heckler*, 771 F.2d 1556, 1566-67 (2d Cir. 1985) (holding that class certification was unnecessary where defendant agreed to the

92

enforcement of a decree in favor of nonparties); *Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir. 1980).

That is the case here. The theory pleaded by Plaintiffs that the MWAP Policy is unconstitutional as applied to patients, based solely on the application and enforcement of the MWAP policy during the years 2017-2019. DOCCS, however, affirmatively withdrew the MWAP policy on February 8, 2021. Dr. Moores confirmed that the policy has been "formally and completely dismantled," "is no longer implemented or enforced in any capacity by DOCCS," and that "[n]either the MWAP policy nor any of the practices and procedures followed thereunder will be resurrected or continued on [her] watch." (A31287, ¶ 14; A31288, ¶ 19). Indeed, Dr. Moores is "proceeding as if this Court has already ordered or directed DOCCS to completely discontinue the MWAP policy across all DOCCS' facilities and will continue to do so regardless of the outcome of this litigation." (A31288, ¶ 19; A38793-38906). The District Court did not provide any analysis for the continuing need for permanent injunctive relief, in light of Dr. Moores' position and the adoption of Policy 1.24A.

In sum, the District Court erred in certifying an injunctive class because Plaintiffs have not shown that that certification of an injunctive class is necessary and did not satisfy the requirements for class certification under Rule 23(b)(2).

## IV. THE DISTRICT COURT ERRED IN GRANTING CLASS COUNSEL ATTORNEY'S FEES UNDER 42 U.S.C. § 1988(b)

Dr. Moores seeks de novo review of the District Court's grant of an award of attorney's fees to class counsel, following its decision on the merits. *See Perez v. Westchester Cnty Dep't of Corr.*, 587 F.3d 143, 149 (2d Cir. 2009). For the reasons that follow, the District Court erred in holding (i) that Plaintiffs are prevailing parties under 42 U.S.C. § 1988, and (ii) that an award of $3,796,902.82 was reasonable.

### A. Plaintiffs Are Not Prevailing Parties

#### i. Plaintiffs Are Not Entitled To Fees Because The Merits Trial Was For Individual-Capacity Claims.

A court may not award attorney's fees against an official-capacity defendant under 42 U.S.C. § 1988 when the prevailing plaintiff sues governmental employees only in their personal capacities. *See Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985) (holding that "a suit against a government official in his or her personal capacity cannot lead to imposition of fee liability upon the governmental entity", and that absent "a distinct cause of action . . . asserted against the entity itself," the plaintiff is not entitled to fees against the entity).

Here, the District Court's finding that Plaintiffs did not assert a *Monell* claim (A39356), confirms that the only claims Plaintiffs proved, if any, were individual capacity claims against individually named providers named in their Second Claim for Relief. The District Court thus erroneously cited *Graham* when it determined

94

"state officials were properly sued in their official capacity" (A45113-45114 [citing *Graham*, 473 U.S. 159 at 170]). Indeed, in *Graham*, the plaintiff's § 1983 action settled in their favor against the Kentucky State Police Commissioner, sued "individually and as Commissioner", and plaintiff was awarded attorney's fees against the Commonwealth of Kentucky, which was originally named as a party but subsequently dismissed prior to settlement. *Graham*, 473 U.S. 159 at 159-60. The *Graham* Court reversed the fee award against the Commonwealth, emphasizing that "there is no cause of action against a defendant for fees absent that defendant's liability for relief on the merits. Naming the Commonwealth for fees did not create, out of whole cloth, the cause of action on the merits necessary to support this fee request." (*Id.* at 170).

Here, the merits trial proceeded based on a legal fiction curated by the District Court, in that Plaintiffs had to prove only the second claim for relief, one for deliberate indifference to medical care, a claim originally made against the individually named defendant medical providers (and never against Dr. Moores in her official capacity), who were then subsequently *severed* from the action. In essence, by the time the merits trial commenced, the second cause of action was against no named party at all. Based on the well-established precedent in *Graham*, the lower court's award of attorneys' fees must be reversed since no proper cause of action was ever made (or tried) against Dr. Moores; nor did Plaintiffs establish

liability against Dr. Moores in her official capacity under *Monell* to be awarded attorney's fees.

### ii. Plaintiffs Do Not Meet The Definition of Prevailing Party Under 42 U.S.C. § 1988.

Even assuming, *arguendo* only, that Plaintiffs somehow made a cognizable claim of deliberate indifference as to Dr. Moores in their second cause of action (they have not), they are still not prevailing parties under the circumstances presented in this case. Here, although a final judgment was reached and a permanent injunction was entered by the District Court, it is well established that entry of a judgment in a party's favor does <u>not</u> automatically render that party prevailing under § 1988. *See Rhodes*, 488 U.S. at 3-4. Rather, under section 1988, plaintiffs are "prevailing parties," and thus eligible for attorneys' fees, only if (1) "they achieve some material alteration of the legal relationship between them and their adversaries," *and* (2) "that change bears a judicial imprimatur." *Perez*, 587 F.3d at 149 (internal quotation marks omitted); *see also Buckhannon Bd. and Care Home, Inc.*, 532 U.S. at 604 (explaining that "enforceable judgments on the merits" and "settlement agreements enforced through a consent decree" entail sufficient judicial sanction to confer prevailing party status).

Here, the Permanent Injunction does not materially alter the legal relationship between the parties because it does not affect, change, or alter DOCCS' behavior towards the plaintiff class. *See Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992) (to

materially alter the relationship, the actual relief obtained must "modify[] the defendant's behavior in a way that directly benefits the plaintiff"); s*ee also Buckhannon*, 532 U.S. at 643 ("[a] plaintiff prevails . . . when a . . . judgment . . . affords redress for the plaintiff's substantial grievances"). The relief obtained by Plaintiffs is not prohibitory, it is not for damages, and it is not for termination of any conduct. The relief is also neither for specific performance, because the permanent injunction Order, in large part, orders that DOCCS follow its own Health Services Policy, 1.24A, *a policy that is already in place*, and has been, since 2021. This Order is, objectively, a preservation of the status quo: The "individualized assessments" ordered are already embodied in the text of 1.24A. (A31316 ["At least annually, the PCP will meet with the patient to discuss the patient's treatment plan"]). The District Court mischaracterized the Order as "go[ing] beyond the text of Policy 1.24A" by referencing the final term that requires Dr. Moores to identify class members whose MWAP medications were discontinued between 2017 and 2023 for "any necessary coding and/or an individualized assessment." (A45116). While this term is not contained in 1.24A, this term affects Dr. Moores more so than it affects the plaintiff class because, notwithstanding what Dr. Moores must do administratively to identify those patients, the plaintiff class would still ultimately receive either (i) 338 coding "and/or" (ii) an individualized assessment – both of which are already accounted for in the text of 1.24A. Therefore, no judicially

sanctioned change has taken place sufficient to warrant Plaintiffs as prevailing parties under *Buchkhannon*.

Next, the District Court further erred when it held that the permanent injunction materially alters Dr. Moores' relationship with Plaintiffs, relying on *Kokkonen*, because "[Dr. Moores] and DOCCS no longer have any legal ability to cease operating under Policy 1.24A, even if it was initially a voluntary policy." (A45117 [quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994), to find that DOCCS' recission of the policy is "inconsequential, as it can no longer freely reverse that decision" without violating a court order]). This finding is inconsistent with the plain language of the Order, which expressly states that Dr. Moores "shall notify the Court and all parties if any change to [] Policy 1.24A is made by DOCCS." (A41242; *see also* A39528-39529 for discussion that this provision be included, whereby Plaintiffs acknowledge that Dr. Moores could change "any policy any day" but insist they should receive notice of any such change).

Notwithstanding this mischaracterization of the Order, a defendant's voluntary change in rescinding the MWAP Policy and implementing HSP 1.24A, although accomplishing what the Plaintiff class sought to achieve by the action, lacks the necessary "judicial imprimatur" of the change to warrant an award for fees. *Buckhannon* defines a "prevailing party" as "one who has been awarded some relief

by the court . . . ." (*Id.* at 603). Here, the judicially sanctioned change in Defendant *would* have been an injunction that rescinded the MWAP Policy, but that did not happen here because MWAP was rescinded three years ago. Thus, since the injunction Order does not actually order the relief initially sought by the Plaintiff class (because it already happened) the Order itself lacks the judicial imprimatur required to establish the material alteration of the relationship between the parties to warrant attorney's fees.

This matter is more akin to *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of New York & New Jersey*, whereby the Southern District found that plaintiffs were not a prevailing party under section 1988 because the Judgment entered was declaratory and did not involve a change or renegotiation of the policy at issue, even though the policy was found to be in violation of the ADA. No. 16-CV-3907, 2018 WL 798873 (S.D.N.Y. Jan. 23, 2018). The Court reasoned, as applicable here, "[w]hile this Court is unaware of any Second Circuit precedent directly on point, courts outside this Circuit have declined to find plaintiffs to be prevailing parties where the declaratory relief in those cases fails to effect **some** change in the defendant's behavior **that benefits the plaintiff**." (*Id.* at *3) (collecting cases) (emphasis added). The facts relied upon by the Southern District were namely that no policy was changed or renegotiated under the judgment. The same is true here. The Order is not a change or renegotiation of neither MWAP, nor of Policy 1.24A,

99

and it is not an Order to have DOCCS act or refrain from acting as a means to provide Plaintiffs with a legal right or entitlement. The evidence relied upon following two trials demonstrates that every single patient who testified is being seen regularly by their providers, routinely see specialists, physical therapists, and are most often prescribed alternatives to their preferred medication which, critically, Plaintiffs' own expert deemed to be reasonable alternatives. Not a single class member testified they were not being treated <u>at all</u>. Indeed, what the testimony and evidence do support is the minimum level of care required by the Constitution; one of medical necessity and "not one simply of desirability." *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) (internal quotation marks and citations omitted).

In sum, to be a prevailing party, the Order must effectuate change in a way that benefits the Plaintiffs. For the reasons above, the Order has not established a "change" in Defendant's behavior because it orders relief in the form of a now very formalized annual pain assessment, to discuss pain management issues for which they have already been seeing that very provider for. Dr. Moores testified that the Pain Assessments now Ordered will not necessarily change the outcome of the medications they are already being prescribed. (A40315-40316).

For all of these reasons, Plaintiffs are not "prevailing parties" under 42 U.S.C. § 1988 and, therefore, are not entitled to any attorney's fees at all.

**B. <u>If Plaintiffs Are Prevailing Parties, The Fee Award Must Be Reduced By Half</u>**

Dr. Moores seeks review of the District Court's calculation of reasonable attorneys' fees for abuse of discretion. *Perez*, 587 F.3d at 149. The District Court erred when it failed to reduce Plaintiffs' lodestar by 50% for the unsuccessful motion to certify a liability class under FRCP 23 (b)(1) and (b)(3). If Plaintiffs did prevail under § 1988 (they did not), they did so for injunctive relief only under FRCP 23(b)(2). Therefore, none of the work related to pursuing the damages action is recoverable for the reasons that follow.

It is well-established that "[t]he fee applicant bears the burden of establishing entitlement to a fee award and documenting the hours reasonably expended on the case." *See Plummer v. Chem. Bank*, 592 F. Supp. 1168, 1171 (S.D.N.Y. 1984). To satisfy this burden, the application must be supported by sufficiently detailed records "to enable the court to ascertain the accuracy of the hours claimed and the nature of the services performed." (*Id.* at 1171); *see also McCann v. Coughlin*, 698 F.2d 112, 131 (2d Cir. 1983) (holding that "a party seeking attorney's fees should provide the court with contemporaneous time records indicating, not only the number of hours worked, but also the matters involved"). Proof of such time records is critical because "[t]he court must have a basis for checking on the requested fee and determining whether the hours claimed were productively spent." *McCann*, 698 F.2d at 131.

Although "[t]here is no precise rule or formula for making [fee reduction] determinations," the Court has discretion to either reduce the award in a line-item fashion, or simply make an across-the-board reduction. *See Hensley v. Eckerhart,* 461 U.S. 424, 436–37 (1983). Courts utilize an across-the-board reduction to account for excessive, repetitive and otherwise unreasonable hours spent by Plaintiff's Counsel on this case. *See Matusick v. Erie Cnty. Water Auth.,* 757 F.3d 31, 64 (2d Cir.2014); *Guardians Ass'n of Police Dep't of New York. v. City of New York,* 133 F. App'x. 785, 786 (2d Cir.2005).

Here, Plaintiffs are not entitled to attorney's fees for work related to their damages claims because the Motion to Certify a liability class was denied, and those damages claims were severed from this matter into separate actions after four years of litigation and only months before trial. Therefore, an across-the-board reduction would be most appropriate because: (i) the ample Second Circuit cases dictate a reduction; and (ii) the work done in preparation to move to certify both an injunctive class and damages class largely required review of hundreds of patients' medical records, neither of which can be discerned from Plaintiffs submissions, necessitating an across-the-board reduction.

First, the District Court wholly ignored the well-established Second Circuit precedent where courts have routinely reduced attorneys' fees for unsuccessful class certification motions under Fed. R. Civ Pro. 23, and especially where, as here,

102

Plaintiffs moved to certify both a liability class and an injunctive class *in the same motion*. *Barfield v. New York City Health and Hosps. Corp.*, 537 F.3d 132, 152-53 (2d Cir. 2008) (affirming the lower court's overall fee reduction by 50% for an unsuccessful motion to certify a class under Rule 23). Here, since Plaintiffs failed in their primary objective to certify a liability class (as expressly reflected in their Second Amended Complaint), they achieved only limited success in the litigation as a whole, which the Second Circuit has held justifies a 50% across the board reduction of the lodestar. (*Id.* at 152-53); *Callari v. Blackman Plumbing Supply, Inc.*, No. CV-113655ADSAKT, 2020 WL 2771008, at *15 (E.D.N.Y. May 4, 2020), *report and recommendation adopted,* No. 211-CV-3655ADSAKT, 2020 WL 2769266 (E.D.N.Y. May 28, 2020) (holding that "since Plaintiffs sought both conditional certification of the [FLSA] collective action and class certification [under Rule 23] in a single motion, an across-the-board reduction of fees [wa]s more appropriate rather than deducting the hours attributable to the unsuccessful class certification motion only"); *see also Custodio v. Am. Chain Link and Constr., Inc.*, No. 06-CV-7148, 2014 WL 116147, at *2 (S.D.N.Y. Jan. 13, 2014); *Siegel v. Bloomberg L.P.,* No. 13-CV-1351, 2016 WL 1211849, at *10-11 (S.D.N.Y. Mar. 22, 2016); *Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 13 (S.D.N.Y. 2015) (same); *Velasquez v. Digital Page, Inc.*, 124 F. Supp. 3d 201, 205 (E.D.N.Y. 2015).

The District Court further erred on this issue when it found, "it was only in the very late stages that counsel [] sought to certify a damages class" and that "[t]he activity during the case was almost entirely devoted to seeking injunctive relief," and that any work "devoted to certification of a damages class [] was really almost negligible." (A45108). However, Plaintiffs' "Prayer for Relief" expressly seeks "Certifying this action as a class action under Fed. R. Civ. P. 23(b)(1)(A), (b)(2) and (b)(3)." (A765, ¶ 1105).

Second, the timekeeper narratives for the non-attorney staff make it nearly impossible to discern whether the reviewing and sorting of medical records was prepared for the damages claims or the injunctive claims. Most of these entries generally include, for example, "RC: Sort Medical Records for J. Hinspeter" and "KG: R. Romero Timeline", with no indication of which side of the litigation the work was performed. (A41574; A41685). The attorney entries are further complicated because only some entries delineate "damages" work versus "injunction" work, but all the other attorney entries in between are similarly irreconcilable. (*See generally, e.g.* A41285-A41523). Thus, the inconsistent and vague nature of Class Counsel's timekeeping record only further reinforces the need for an overall reduction. *Pennacchio v. Powers,* No. 05-CV-985 (RRM) (RML), 2011 WL 2945825, at *2 (E.D.N.Y. July 21, 2011) (reducing the overall fee award by 60% for vagueness).

Thus, if Appellees are entitled to a Fee Award at all, the lodestar must be reduced by at least 50%.

## **CONCLUSION**

For the foregoing reasons, the District Court's judgment should be reversed.

Date:  May 6, 2024

Respectfully submitted,

By:    \s\ Oriana L. Kiley
Oriana L. Kiley
William S. Nolan
Robert S. Rosborough, IV
WHITEMAN OSTERMAN & HANNA LLP
Attorneys for Defendant-Appellant
One Commerce Plaza
Albany, New York 12260
518-487-7600

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 23,740 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated: Date:  May 6, 2024

Respectfully submitted,


By:   \s\ Oriana L. Kiley
      Oriana L. Kiley
      William S. Nolan
      Robert S. Rosborough, IV
      WHITEMAN OSTERMAN &
      HANNA LLP
      Attorneys for Defendant-Appellant
      One Commerce Plaza
      Albany, New York 12260
      518-487-7600